**Pedro MEDINA, Petitioner–Appellant,**

v.

**Harry K. SINGLETARY, Florida
Department of Corrections,
Respondent–Appellee.**

No. 93–2523.

United States Court of Appeals,
Eleventh Circuit.

July 17, 1995.

Judith J. Dougherty, Assistant Capital Collateral Representative, Office of the Capital Collateral Representative, Gail E. Anderson, Tallahassee, FL, for appellant.

Margene A. Roper, Asst. Atty. Gen., Dept. of Legal Affairs, Daytona Beach, FL, for appellee.

Before DUBINA, BLACK and CARNES, Circuit Judges.

BLACK, Circuit Judge:

Pedro Medina, a Florida inmate who was convicted of first-degree murder and sentenced to death, appeals the district court's denial of his petition for a writ of habeas corpus. Medina contends that his conviction and/or sentence were invalid on thirteen constitutional grounds. We affirm the district court's denial.

## I. BACKGROUND

Medina came to the United States from Cuba in 1980 as part of the Mariel boatlift when he was nineteen years old. He was released from a Cuban mental hospital immediately before leaving Cuba. Medina lived in the Orlando area and was befriended by Dorothy James. In late 1981, Medina moved to Tampa.

James was found dead in her Orlando home on April 4, 1982. She had been gagged, stabbed multiple times, and left to die. Early in the morning of April 8, 1982, Medina was found asleep in James' automobile at a rest stop on I–10 near Lake City and was arrested for theft of the automobile. The next day, Detective Daniel Nazarchuk, a detective investigating the murder of James, interviewed Medina in the Lake City jail about the automobile and the murder. Medina was arrested and indicted for the murder of James.

Medina requested psychiatric evaluation and was examined by two psychiatrists. Each determined that Medina met the statutory criteria for competency to stand trial. A competency hearing, at which Medina testified, was held the day before trial. The court found that Medina was competent to stand trial.

Medina was tried before a jury March 15–18, 1983, and was convicted of first-degree murder and auto theft. He was sentenced to five years' imprisonment for the auto theft conviction. The jury, by a 10 to 2 vote, recommended the death penalty for the murder conviction. The trial court found two aggravating circumstances—the murder was "especially heinous, atrocious, and cruel" and was "committed for pecuniary gain"—and a single mitigating circumstance—Medina had "no significant history of prior criminal activity." *See* Fla.Stat. § 921.141. The court found that the aggravating circumstances outweighed the mitigating circumstance and sentenced Medina to death.

Medina appealed to the Florida Supreme Court, which affirmed both the conviction and sentence. *Medina v. State*, 466 So.2d 1046 (Fla.1985). Medina then filed a motion for postconviction relief pursuant to Fla. R.Crim.P. 3.850. The trial court determined that twelve of his fourteen claims were or could have been raised on direct appeal and were therefore procedurally barred. The court held an evidentiary hearing on the other two claims: withholding of material, exculpatory evidence by the state in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and ineffective assistance of counsel during the sentencing phase in that counsel failed to investigate and present compelling and available mitigation evidence. The trial court denied all relief and the Florida Supreme Court affirmed the denial. *Medina v. State*, 573 So.2d 293 (Fla. 1990). Medina filed a state petition for a writ of habeas corpus and the Florida Supreme Court denied the petition. *Medina v. Dugger*, 586 So.2d 317 (Fla.1991).

Medina filed a federal petition for a writ of habeas corpus alleging numerous constitutional violations. The petition was denied by the district court and is the subject of this appeal.

## II. THE CLAIMS

On appeal, Medina raises thirteen claims, some of which consist of several separate

issues. We find that only three of these claims merit discussion [1] and will discuss each individually.

## A. The Statement Claim

### 1. Parties' positions.

Medina alleges that the statement given to Nazarchuk on April 9, 1982, should not have been admitted at trial because Nazarchuk violated Medina's constitutional right to remain silent when he continued the interview after Medina indicated that he did not wish to talk. Medina further alleges that the error in admitting the statement was not harmless even though the statement was exculpatory because the state offered no direct evidence of his guilt and "distracted attention from the lack of direct evidence by suggesting that Mr. Medina's statements were 'incredible.'"

The state responds that, under the circumstances of this case, Medina's invocation of his right to remain silent was ambiguous and that it was reasonable for Nazarchuk to seek to clarify Medina's response. The state further responds that admission of the statement, if error, was harmless error because the statement was exculpatory, because Medina testified at trial, and because Medina was not put on the witness stand merely to counteract the April 9 statement but to explain "just why *he* was found in the victim's car with a knife that could have killed her."

### 2. Legal standard.

■ If, during custodial interrogation, a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966).

> Through the exercise of his option to terminate questioning [a suspect] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting.... [T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored."

*Michigan v. Mosley,* 423 U.S. 96, 103–04, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975).

■ Law enforcement officers are not required to terminate an interrogation unless the invocation of the right to remain silent is unambiguous. *Davis v. United States,* — U.S. —, —, 114 S.Ct. 2350, 2355, 129

1. The following issues and sub-issues raised by Medina are procedurally barred or are without merit: (1) allegations that Medina was denied effective assistance of counsel because counsel failed to provide the mental health experts with relevant information about Medina's competency; (2) allegations that the statement made by Medina on April 9, 1982, was (a) involuntary because Medina did not understand his rights and (b) admitted in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because Medina never indicated that he understood his rights; (3) allegations that Medina's constitutional rights were violated when he was forced to wear handcuffs, shackles, and a leg brace in the presence of the jury during trial and in the presence of the venire panel before trial; (4) allegations that Medina's constitutional rights were violated because he was not present at the hearing to determine whether he should be shackled; (5) allegations that the trial court improperly limited Medina's right to cross-examine witnesses Reinaldo Dorta and Michael White; (6) allegations that Medina was denied

effective assistance of counsel during the penalty phase of his trial because counsel failed to investigate and present available mitigation evidence; (7) allegations that the state violated *Brady* by withholding information about a second knife and about the status of witness Michael White; (8) allegations that Medina was denied effective assistance of counsel during the guilt/innocence phase of his trial because counsel failed to investigate and present Billy Andrews as a possible suspect for the murder; (9) allegations that the admission of evidence regarding the stabbing of Michael White, regarding Medina's alleged battery upon a law enforcement officer, and regarding Medina's alleged attempt to escape rendered the trial fundamentally unfair; (10) allegations that the trial court erred in denying Medina's requested instruction on circumstantial evidence; (11) allegations that the evidence was insufficient to support Medina's conviction; and (12) allegations that the aggravating circumstances used to support the death sentence were not proved beyond a reasonable doubt. Medina is not entitled to an evidentiary hearing on these issues.

L.Ed.2d 362 (1994).[2] "[A]n accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith v. Illinois,* 469 U.S. 91, 100, 105 S.Ct. 490, 495, 83 L.Ed.2d 488 (1984) (emphasis in original). The Supreme Court has suggested, however, that "an accused's request ... may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself." *Id.* The inquiry as to whether a suspect's invocation of his right to remain silent was ambiguous or equivocal is an objective one. *Davis,* — U.S. at —, 114 S.Ct. at 2355. "A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." *Coleman v. Singletary,* 30 F.3d 1420, 1424 (11th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1801, 131 L.Ed.2d 727 (1995). *See also Davis,* — U.S. at —, 114 S.Ct. at 2355. Thus, "[t]he determination of whether a suspect's right to cut off questioning was scrupulously honored requires a case-by-case analysis." *Christopher v. Florida,* 824 F.2d 836, 840 (11th Cir.1987).

■ Although "the ultimate issue of voluntariness is a legal question requiring independent federal determination," "[w]e normally give great deference to the factual findings of the state court." *Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991) (quotations omitted). If the state court held a full and fair hearing on the issue raised by the habeas petition, and the record fairly supports the factual findings of the state court, the federal courts presume the factual findings to be correct. 28 U.S.C.A. § 2254(d) (West 1994); *Weeks v. Jones,* 26 F.3d 1030, 1034 (11th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1258, 131 L.Ed.2d 137 (1995); *Cave v.*

*Singletary,* 971 F.2d 1513, 1516 (11th Cir. 1992).

■ We review the district court's findings of historical fact for clear error, even when the district court's findings are drawn solely from documents, records, or inferences from other facts. *Spaziano v. Singletary,* 36 F.3d 1028, 1032 (11th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 911, 130 L.Ed.2d 793 (1995). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it." *Id.* (quoting *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).

### 3. *Factual and procedural background.*

On April 9, 1982, Medina was interviewed at the Lake City jail by Detective Daniel Nazarchuk, the Orange County deputy sheriff in charge of the investigation of Dorothy James' murder. Detective Diane Payne, also from Orange County, was with Nazarchuk but did not actively participate in the interview. As was the normal practice, the interview with Medina consisted of two parts: (1) an initial, unrecorded interview to get everything in perspective so that the recorded interview could follow a logical order[3] and (2) the subsequent recorded interview. The initial interview lasted approximately thirty to forty-five minutes and the recorded interview lasted approximately one hour. The recorded interview followed immediately after the unrecorded interview, with no break between the two.

During the preliminary interview, Nazarchuk explained to Medina why he and Payne had come to Lake City. He explained that they were police officers, that Medina was in jail because he had been found in James' car which had been stolen, and that James "was deceased as a result of a homicide." Nazar-

---

2. Although *Davis* specifically addressed the right to have counsel present during interrogation, "[t]he law relating to requests for counsel and restrictions on further questioning parallels the law relating to requests invoking the right to remain silent." *Delap v. Dugger,* 890 F.2d 285, 294 n. 9 (11th Cir.1989), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2628, 110 L.Ed.2d 648 (1990).

3. Nazarchuk testified at trial that conducting a preliminary unrecorded interview was his normal practice and that the purpose of the preliminary interview was "[t]o try to get it, everything in its perspective. In other words, when you get it started it will fluctuate and be confusing. And it's to help get the interview oriented as a step by step procedure."

chuk also advised Medina of his rights by reading a standard *Miranda* card to him. He told Medina that all questioning would stop if Medina did not want to talk to them. Medina indicated that he understood his rights and that he was willing to talk with the detectives. Medina talked freely with the detectives, denying any knowledge about the death of James and denying that he had stolen the car.[4]

Following the lengthy preliminary conversation with Medina about James, the car, and Medina's actions, and believing that Medina was willing to continue to talk about the case, Nazarchuk started a tape recorder. He asked Medina if it was all right to have the tape recorder on, stated that they were police officers investigating the James case, and again advised Medina of his rights by reading them from the *Miranda* card. When Nazarchuk asked Medina if he wanted to talk to the detectives, Medina responded in the

negative. Nazarchuk immediately asked, "You don't want to talk to us or you do want to talk to us?" because, as he explained at trial, he "wasn't too sure what [Medina] meant by no [and] asked him to clarify it." Medina then indicated that he wanted to continue the interview.[5]

Two separate and independent state hearings were held on whether the recorded interview should be suppressed. During Medina's preliminary hearing in the county court, Judge Gary L. Formet heard testimony from Nazarchuk and reviewed the transcript of the tape. Immediately before Medina's trial in the state circuit court, Judge Rom W. Powell heard testimony from both Nazarchuk and Medina and listened to the tape while reviewing the transcript. At both hearings, Nazarchuk testified that during the unrecorded interview, Medina indicated that he understood his rights as read to him, but he re-

---

4. Nazarchuk described this portion of the interview during the preliminary hearing:

> Well, we explained to him about the car being taken, being stolen and that it was for his arrest. He denied it, and then he started going into explaining to me that he was not in the car, that he was thrown in the car by the Florida Highway Patrol, Trooper Wilson, that he was only walking around the car. And when I further asked him about if he was in Orlando, he said he hadn't been in Orlando since December of 1981. I tried to further relate from him how he arrived to be in the vicinity of the car. Then he said he had hitch-hiked from Tampa on I-75, that two white people had picked him up and they drove to Ocala, he got a motel room in Ocala and that they drove him up to the vicinity of where the car was found or somewhere in there, Columbia, Lake City, and he fell asleep and that they were gone.

5. The transcript of the recorded interview reflects the following exchange:

> DETECTIVE NAZARCHUK: ... Okay, Pedro, right now there's a tape recorder going. Is it okay to have the tape recorder going?
> PEDRO MEDINA: (No audible response).
> DET. NAZARCHUK: Would you just say yes or no, 'cause the....
> P. MEDINA: Yes.
> DET. NAZARCHUK: Yes, okay. But before—before we say anything again, like I explained to you before, okay, we're police officers. We're investigating this case and I have to read these rights to you, okay.
> One, you have the right to remain silent.
> ....

> Five, do you desire to consult with or talk to an attorney first, or to have one during this interview? I need an answer of yes or no.
> P. MEDINA: No.
> DET. NAZARCHUK: Okay. If, at any time hereafter, you wish to remain silent and have an attorney present, all questioning will be stopped. Now, has anyone, at any time, threatened you, coerced you or promised you anything in order to induce you to make a statement now? Have we done anything to you to encourage you to talk to us at this time? Have we done anything to you?
> P. MEDINA: No.
> DET. NAZARCHUK: (Simultaneous Speech) I need an answer, yes or no.
> P. MEDINA: No.
> DET. NAZARCHUK: Okay. Now, all these rights I read to you, do you understand them?
> P. MEDINA: (No audible response).
> DET. NAZARCHUK: You'll have to say yes or no because—for the tape recorder. Did you understand all the rights I read to you, Pedro?
> P. MEDINA: (Indiscernible words).
> DET. NAZARCHUK: Yes?
> P. MEDINA: (No audible response).
> DET. NAZARCHUK: Okay. Do you wish to talk to us at this time?
> P. MEDINA: Huh?
> DET. NAZARCHUK: Do you wish to talk to us at this time?
> P. MEDINA: No.
> DET. NAZARCHUK: You don't want to talk to us or you do want to talk to us?
> P. MEDINA: Okay, let me tell you what I'm think.
> DET. NAZARCHUK: Sure.
> The interview then continued.

fused to sign the rights waiver card because he could not read English. Nazarchuk further testified that Medina indicated that he would talk to them at that time, that Medina showed no hesitancy in speaking with them, and that Medina talked freely with them both before and after they began recording the interview. Nazarchuk acknowledged that, during the recorded interview, Medina answered "No" to the question of whether he wanted to talk at that time. Nazarchuk testified, however, that it was not clear to him whether Medina did or did not want to talk.

At the pretrial hearing, Medina testified that he did not understand everything Nazarchuk told him regarding his rights. Medina also testified that, before the tape recorder was turned on, they had a "long conversation" and "I did say that I didn't want to talk to him. I wanted to know who he was by, you know. He went around the bush, you know. He never told me who he was."

Both state judges found that Medina's indication that he did not want to talk to the detectives was not a clear invocation of his right to remain silent and that Medina reinitiated the interview after Nazarchuk asked a clarifying question. Judge Formet found that Medina was "freely conversing with [Nazarchuk]" before the tape recorder was turned on and that:

> given the circumstances, the totality that we're looking at here . . ., in fact, it was not clear in the mind of the detective that there had been a refusal or an assertion of his right to remain silent and I think based upon the preliminary leading up to that, that is a normal reaction. It is not clear to me, having read this, that this is a definite and clear assertion of his right to remain silent. I find nothing wrong with the follow-up question. . . .

Judge Powell found that "the transcript . . . [was] accurate with the tape" and that "when [Medina] talked to Nazarchuk off the tape, that is to say before the tape was turned on, he made statements and never asserted his right to remain silent." Judge Powell denied the motion to suppress the April 9 statement and the tape was played for the jury during Medina's trial.

On direct appeal, the Florida Supreme Court noted that "[a] ruling on a motion to suppress is presumptively correct." *Medina v. State,* 466 So.2d 1046, 1049 (Fla.1985). The Court then ruled that "the suppression hearing testimony supports the court's finding the statement to have been made freely and voluntarily." *Id.* at 1050.

The district court determined that the April 9 statement was freely and voluntarily made because Medina did not "positively and adequately assert his right to discontinue the questioning," because he "volunteered the statements after the police attempted to clarify whether [he] wanted to continue the interrogation," and because there was no coercion by the investigators. The district court also noted that if the trial court erred in admitting the April 9 statement, the error was harmless because the statement was exculpatory and because Medina testified at trial denying any involvement in the crime.

### 4. *Analysis and holding.*

■ Initially, we note that Medina has not challenged the adequacy of the state court hearings on the admissibility of the April 9 statement. Both hearings were full and fair and addressed the specific issue raised in the petition for a writ of habeas corpus: Whether Nazarchuk violated Medina's right to remain silent. Three of the factual findings of the state courts are pertinent to the issue of whether Medina invoked his right to remain silent. We will, therefore, examine these three factual findings to determine if they are fairly supported by the record.

First, both state courts found that during the preliminary, unrecorded interview, Medina made statements and never asserted his right to remain silent. The record supports this conclusion. Medina talked freely and without hesitation about his activities. For a period of approximately thirty to forty-five minutes, he discussed his activities with Nazarchuk. He told Nazarchuk that he was not in James' car but was thrown into the car by the Florida Highway Patrol, that he had not been in Orlando since December of 1981, that he had hitchhiked from Tampa, that he was given a ride by two white people who took him to the Lake City vicinity, and that he fell

asleep and the white people were gone when he awoke. Medina also told Nazarchuk that he did not know anything about James' death.

Second, the state trial court found that the transcript accurately reflects the recorded conversation between Nazarchuk and Medina. The transcript of the recorded interview indicates that Medina replied "No" when asked if he wanted to talk to the detectives at that time. The transcript uses the word "No" to indicate Medina's response to several different questions: (1) when asked whether he wanted to consult with or talk to an attorney or to have one present during the interview, Medina replied "No"; (2) when asked whether anyone had threatened or coerced him to make a statement or had encouraged him to talk to the detectives, Medina replied "No"; and (3) when asked whether he wanted to talk to the detectives, Medina replied "No."

When we listened to the tape, however, what we heard indicates that the specific word used by Medina in reply to each of these questions was different. When asked whether he wanted to talk to an attorney, Medina clearly replied "No." When asked whether he had been threatened or encouraged to make a statement, Medina clearly replied "Nah." When asked whether he wanted to talk to the detectives, Medina's reply was neither the clear "No" nor the clear "Nah" that he had used in response to the previous questions. Although we find that the transcript does not exactly reflect the recorded portion of the conversation as we heard it, we also find that there was sufficient evidence to conclude that none of the questions was answered in the affirmative. We therefore hold that the record fairly supports the factual finding of the state court and that Medina replied "No" when asked whether he wanted to talk to the detectives at that time.

Third, the county court, in the preliminary hearing, found that during the recorded conversation, Nazarchuk was not sure whether Medina had asserted his right to remain silent. The record supports the state court's finding. But, whereas the state court found that Nazarchuk *subjectively* believed that Medina's response was ambiguous, we must determine whether Nazarchuk's belief was *objectively* reasonable. As indicated above, Medina talked freely and at length with Nazarchuk before the tape recorder was turned on. Medina did not object to having the tape recorder started, made no objection to further conversation, and clearly replied "Yes" when asked "Is it okay to have the tape recorder going?" Nazarchuk fully expected Medina to continue talking after the tape recorder was turned on. In the context of Medina's willingness to talk during the preliminary interview and willingness to have the tape recorder turned on, and in light of the expectation that the interview would continue on tape, it was reasonable for Nazarchuk, as it would have been for any officer, not to understand what Medina meant when he answered the question.

■ The broader issue which this Court must decide, however, is whether "No" can ever be ambiguous or equivocal or whether we should adopt a *per se* rule that a suspect's response of "No" when asked if he wants to talk to a police officer means the officer cannot go forward with questioning. The Supreme Court has suggested that "events preceding the [response]" or "nuances inherent in the [response] itself" can create ambiguity and make the response equivocal, *see Smith*, 469 U.S. at 100, 105 S.Ct. at 495, as has this Court, *see Henderson v. Singletary*, 968 F.2d 1070, 1073 (11th Cir.) (noting that the determination that a defendant had not invoked his right to remain silent was "bolstered by" the defendant's earlier statement that he might be willing to talk later), *cert. denied*, — U.S. —, 113 S.Ct. 621, 121 L.Ed.2d 554 (1992); *Delap v. Dugger*, 890 F.2d 285, 291–93 (11th Cir.1989) (finding that the suspect's questions about how much longer the interview would last and when he could leave, taken in context, were not an invocation of his right to remain silent), *cert. denied*, 496 U.S. 929, 110 S.Ct. 2628, 110 L.Ed.2d 648 (1990). Other circuits have also indicated that a court must consider the entire context in determining whether a suspect has invoked his or her constitutional rights. *See, e.g., United States v. Johnson*, 56 F.3d 947, 955–56 (8th Cir.1995) (noting that the

court should consider the defendant's statements "as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent"); *United States v. Scurlock,* 52 F.3d 531, 536–37 (5th Cir.1995) (finding that the defendant's comment that she needed a lawyer, taken in context, which included the defendant's previous admission of involvement in the crime as well as her previous agreement to give a recorded statement, was not a clear invocation of her right to counsel); *Lord v. Duckworth,* 29 F.3d 1216, 1220–21 (7th Cir.1994) (finding that defendant's statement, "I can't afford a lawyer but is there anyway [sic] I can get one?" taken in context, which included a previous "lengthy, tape-recorded statement to the police," was, "at best," ambiguous); *United States v. Quiroz,* 13 F.3d 505, 512 (2d Cir. 1993) (indicating that the refusal of a suspect to sign a *Miranda* waiver form until he had spoken with his attorney might create an ambiguity as to the scope of the request if the officers had known that the suspect had previously answered questions without requesting counsel); *Nash v. Estelle,* 597 F.2d 513, 519 (5th Cir.) (en banc) [6] (finding that a request for an attorney during a tape-recorded interview was equivocal, in part because the defendant, during a previous, unrecorded interview, confessed and the assistant district attorney "began the conversation with the expectation that [the defendant] would repeat his confession"), *cert. denied,* 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979).

We decline to adopt a *per se* rule. Taking into consideration the events preceding Medina's response, Medina's "No" was ambiguous and did not clearly indicate his desire to remain silent. Nazarchuk, uncertain as to what Medina meant, immediately asked a single, clarifying question: "You don't want to talk to us or you do want to talk to us?" Medina's response to that question indicated that Medina had not invoked his right to remain silent and the interview properly continued.

We therefore hold that Medina did not unambiguously and unequivocally invoke his right to remain silent and that the continued interview did not violate Medina's right to remain silent. To prohibit a clarifying question under the circumstances which Nazarchuk faced on April 9, 1982, would "transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity." *Mosley,* 423 U.S. at 102, 96 S.Ct. at 326.

## B. *The Competency Claims*

### 1. *Parties' positions.*

Medina alleges that (1) his right to procedural due process was violated when the trial court refused to conduct a competency hearing during trial despite indicia that Medina was incompetent to proceed and (2) his right to substantive due process was violated because he was, in fact, tried while mentally incompetent. He also alleges that the mental health evaluations performed at the time of his trial were professionally inadequate. He alleges that, because he presented clear and convincing evidence raising a real, substantial, and legitimate doubt about his competence, he is entitled to a postconviction evidentiary hearing.[7]

The state responds that Medina had a "full and fair" competency hearing the day before his trial began; that the procedural due process claim based on the need for an additional competency hearing was procedurally defaulted because Medina did not raise the issue on direct appeal although he did raise another competency issue; that the facts known to the trial court were not sufficient to raise a bona fide doubt as to Medina's continuing competence; that there is no evidence that the court-appointed mental health experts performed an inadequate investigation; that the court, which made the actual decision about Medina's competence, was aware of Medina's background, his history of mental health problems, and his jail medical records at the time the decision was made;

---

6. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

7. Medina's claim of ineffective assistance of counsel for failing to assure that he received adequate mental health assistance is without merit. *See supra* note 1.

and that Medina has not presented facts sufficient to create substantial doubt about his competence, entitling him to an evidentiary hearing.

### 2. *Legal standard.*

■ The Due Process Clause of the Fourteenth Amendment prohibits states from trying and convicting mentally incompetent defendants. *James v. Singletary,* 957 F.2d 1562, 1569–70 (11th Cir.1992) (citing *Pate v. Robinson,* 383 U.S. 375, 384–86, 86 S.Ct. 836, 841–42, 15 L.Ed.2d 815 (1966); *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). The test for determining competence to stand trial is "whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky,* 362 U.S. at 402, 80 S.Ct. at 789.

■ A petitioner may make a procedural competency claim by alleging that the trial court failed to hold a competency hearing after the defendant's mental competence was put at issue. *Pate,* 383 U.S. at 385, 86 S.Ct. at 842. To prevail on the procedural claim, "a petitioner must establish that the state trial judge ignored facts raising a 'bona fide doubt' regarding the petitioner's competency to stand trial." *James,* 957 F.2d at 1572 n. 15 (citing *Fallada v. Dugger,* 819 F.2d 1564, 1568 (11th Cir.1987)). Even if a defendant is mentally competent at the beginning of his trial, the trial court must continually be alert for changes which would suggest that he is no longer competent. *Drope v. Missouri,* 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975). Although there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed," "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant." *Id.* *Pate* established "a rebuttable presumption of incompetency upon a showing by a habeas petitioner that the state trial court failed to hold a competency hearing ... despite information raising a bona fide doubt as to the petitioner's competency," *James,* 957 F.2d at 1570, but the petitioner bears the burden of showing that "objective facts known to the trial court were sufficient to raise a bona fide doubt," *Reese v. Wainwright,* 600 F.2d 1085, 1091 (5th Cir.), *cert. denied,* 444 U.S. 983, 100 S.Ct. 487, 62 L.Ed.2d 410 (1979). A *Pate* claim "can and must be raised on direct appeal" because an appellate court hearing the claim "may consider only the information before the trial court before and during trial." *James,* 957 F.2d at 1572.

■ A petitioner may make a substantive competency claim by alleging that he was, in fact, tried and convicted while mentally incompetent. *Id.* at 1571. In contrast to a procedural competency claim, however, "a petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence." *Id.* A petitioner who presents "clear and convincing evidence" creating a "real, substantial and legitimate doubt" as to his competence to stand trial is entitled to a hearing on his substantive incompetency claim. *Id.* at 1573 (quoting *Fallada,* 819 F.2d at 1568 n. 1). To show entitlement to a postconviction evidentiary hearing on a substantive competency claim, "the standard of proof is high [and] the facts must positively, unequivocally, and clearly generate the legitimate doubt." *Card v. Singletary,* 981 F.2d 481, 484 (11th Cir.1992) (quotations omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 121, 126 L.Ed.2d 86 (1993). A presumption of correctness attaches to a state court's finding of competence and a federal habeas court must determine that the finding is not "fairly supported by the record" before it may overturn the state court's decision. *Maggio v. Fulford,* 462 U.S. 111, 117, 103 S.Ct. 2261, 2264, 76 L.Ed.2d 794 (1983); *Card,* 981 F.2d at 484 n. 5 (citing *Demosthenes v. Baal,* 495 U.S. 731, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990)). A district court's determination that there is insufficient evidence to generate a substantial and legitimate doubt as to a petitioner's competence to stand trial is reviewed for clear error. *Card,* 981 F.2d at 483–84.

"[N]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." *Id.* at 487–88 (quoting *United States ex rel. Foster v. DeRobertis,* 741 F.2d 1007, 1012 (7th Cir.), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 972, 83 L.Ed.2d 975 (1985)). Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial. *McCune v. Estelle,* 534 F.2d 611, 612 (5th Cir.1976). The fact that a defendant has been treated with anti-psychotic drugs does not *per se* render him incompetent to stand trial. *Fallada,* 819 F.2d at 1569.

When the competence of a defendant is called into question, the defendant is entitled, "at a minimum, ... [to] access to a competent psychiatrist who will conduct an appropriate examination." *Ake v. Oklahoma,* 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985). He does not, however, have "a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Id.* Nor is he entitled to a favorable psychiatric opinion. *Martin v. Wainwright,* 770 F.2d 918, 935 (11th Cir.1985), *modified in unrelated part,* 781 F.2d 185, *cert. denied,* 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986). In Florida, a defendant who raises the issue of his competence is entitled to examination by "no more than 3, nor fewer than 2" mental health experts. Fla.R.Crim.P. 3.210(b).

If a state prisoner fails to raise a claim in state court, or attempts to raise a claim in an improper manner, and state procedural rules preclude the state courts from hearing the merits of the claim, then the federal habeas court is also precluded from hearing its merits, absent a showing of cause and prejudice. *Wainwright v. Sykes,* 433 U.S. 72, 80, 97 S.Ct. 2497, 2503–07, 53 L.Ed.2d 594 (1977). "[W]here the state court correctly applies a procedural default principle of state law, *Sykes* requires the federal court to abide by the state court's decision." *Harmon v. Barton,* 894 F.2d 1268, 1270 (11th Cir.), *cert. denied,* 498 U.S. 832, 111 S.Ct. 96, 112 L.Ed.2d 68 (1990). To show cause for procedural default, the petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). Under Florida law, a petitioner is not entitled to collateral relief for a claim which could or should have been raised at trial and, if preserved, on direct appeal of the judgment and sentence. *Tejada v. Dugger,* 941 F.2d 1551, 1556 (11th Cir.1991) (citing Fla. R.Crim.P. 3.850), *cert. denied,* 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992). The *Sykes* procedural default rule does not, however, preclude review on the merits of a postconviction incompetency claim, even if the claim was not raised on direct appeal. *Adams v. Wainwright,* 764 F.2d 1356, 1359 (11th Cir.1985) (citing *Pate,* 383 U.S. at 384, 86 S.Ct. at 841), *cert. denied,* 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986).

### 3. *Factual and procedural background.*

Before trial, Medina requested the appointment of two psychiatrists "to determine his mental state at the time of the commission of the offense charged and further to determine his present competence to assist his counsel in the preparation of his defense." The request noted Medina's history of mental problems and suggested that he "appears to suffer from mental infirmity to the extent it's difficult to prepare a defense." The court appointed two psychiatrists, Dr. Arturo Gonzalez and Dr. J. Lloyd Wilder, as experts to examine Medina to determine whether he was competent to stand trial. The psychiatrists jointly examined Medina at the Orange County jail on January 14, 1983. They conducted "a typical psychiatric clinical diagnostic examination" during an interview which lasted approximately two hours, "obtaining a history and doing a mental status examination."

Dr. Gonzalez reported that Medina "answer[ed] questions promptly with coherency and relevancy" and was "well oriented as to time, place and person." He relayed Medina's past history, including his background in Cuba and his history of mental health problems. Dr. Gonzalez stated his opinion that

"the defendant meets the statutory criteria for competency to stand trial" and detailed the reasons for his opinion. He further stated that "Medina should be able to relate to his attorney in a relevant and coherent fashion" and that "he is capable of coping with the stress of incarceration prior to his trial without any significant deterioration in his mental status."

Dr. Wilder's report also relayed information about Medina's background history. The report noted that Medina's "impaired" fund of general information was "a product of his education and background rather than any mental illness" and that Medina's talk of God sitting next to him was "more of a religious or pseudo-religious experience in time of trouble than a hallucination or delusion." Dr. Wilder stated that, in his opinion, Medina

> meets the criteria listed in your order quoted from 918.15(1) of the Florida Statutes, which includes appreciation of charges, range and nature of possible penalties, understanding of the adversary nature of the legal process, and capacity to disclose to his attorney pertinent facts surrounding the alleged offense. Also his ability to relate to his attorney and assist his attorney in planning a defense, his capacity to realistically challenge prosecution witness, and his ability to manifest appropriate courtroom behavior.

At the hearing on pretrial motions, Medina moved for an additional psychiatric examination because "under the Florida Rules of Criminal Procedure, Rule 3.210, the Defendant may have three (3) psychiatrists examine him to determine competency." Counsel argued that Medina had "some deep seated problems" and "some severe emotional problems." In response, the court noted: "If there had been a split of opinion between the psychiatrists . . . I would appoint a third one to resolve it or see which way he would go."

As there was no split, the court denied the motion.

A competency hearing was held before the trial judge the day before Medina's trial began. Both parties stipulated that the reports from the two psychiatrists be considered as evidence for the purposes of the hearing. Medina testified at the competency hearing. He relayed to the court an incident of sleepwalking when he was approximately five years old; an incident of hospitalization for depression when he was sixteen or seventeen years old and was denied admission to college; and a second incident of hospitalization in a mental hospital when he was eighteen years old during which he was released at night but taken back during the day for treatment. In response to questions from the court, Medina described his personal reading and his educational activities while in jail, including taking classes to pass the GED and to learn English. Medina's jail medical records were also admitted into evidence. In reviewing the medical records, counsel for Medina called the court's attention to the time in August 1982 when Medina was placed under suicide watch, but the court noted several entries where Medina had exhibited no strange or unusual behavior. During the hearing, Medina's counsel renewed his motion for a third psychiatric examination, arguing that the reports from the previously appointed psychiatrists did not detail how the criteria for legal competence were met. The motion was denied.

Based on the evidence presented, the court found Medina to be competent to stand trial. Specifically, the court noted that, while testifying, Medina appeared "to be rational, understanding, certainly able to communicate."

The trial transcript confirms several instances of courtroom behavior on the first and second days of trial which Medina alleges reflect his mental incompetence.[8] Addi-

---

8. (1) During initial voir dire of the jury panel, Medina laughed after counsel for the state asked if any juror would have a problem with the fact that Medina was a "black Cuban male."

(2) Preceding actual selection of the jury, the court explained to Medina the process which would be followed in making the final jury selection and asked if Medina understood. Medina asked questions to clarify what the court was saying and then indicated that he understood the process. Medina also asked the court if the jury knew how long he had been in jail, argued that they should know, commented that he wanted something to eat, and then apologized to the court for not speaking like a professional.

tionally, on the morning of the second day, before Medina was brought into the courtroom, the officers guarding Medina reported that he was "loud, boisterous, and hostile;" that it took three officers to restrain him that morning; that over the past months he had been very unpredictable, calm for several days and then very hostile to other inmates and officers; that he usually calmed down when placed in chains or shackles; and that it appeared that he had a very violent temper which could be set off by "the least little thing." Counsel again moved for an additional psychiatric exam and the court denied the motion. The officers indicated that Medina would create a disturbance in the courtroom if brought in at that time but suggested that in thirty minutes or an hour he might not be a problem. Co-counsel, who left the courtroom to check on Medina, reported that Medina was "agitated" but that he said he would calm down and behave. The court ordered that Medina be put in restraints and, if he was calm, be brought to the courtroom. Medina was brought to the courtroom.

On the fourth day of trial, against advice of counsel, Medina testified on his own behalf. He admitted that he had been at James' home on the night she was killed but denied any involvement in her death. He testified coherently about his activities on the evening

of the murder and following the murder up to the time of his arrest. He stated that he thought James had been killed by three Cubans who were looking for him. Medina concluded by stating that he had chosen to testify so that he could tell the jury the truth about what had happened. Medina also testified coherently on his own behalf during the penalty phase of his trial.

On direct appeal, Medina raised only one competency issue: whether the trial court erred in denying his motion for examination by a third psychiatrist. The Florida Supreme Court found that the trial court had not abused its discretion in denying the motion "after two experts had already found Medina competent." *Medina v. State*, 466 So.2d 1046, 1048 n. 2 (Fla.1985).

In his Rule 3.850 Motion to Vacate, Medina raised several competency issues.[9] Prior to the evidentiary hearing, the trial court found that the competency claims, as well as certain other claims, were "without merit because they were or could have been raised by direct appeal." The evidentiary hearing was limited to two issues: whether a *Brady* violation had occurred and whether counsel was ineffective for failing to present nonstatutory mitigating evidence, including evidence of

(3) After a short recess following the discussion above, Medina objected to having been hand-cuffed, complained that he wasn't being given a chance to talk even though he had been waiting in jail for a year, complained that "they" were "try[ing] to put a murder case on me," and continued to protest his innocence while his counsel was making a motion for a mistrial. As a result of Medina's outburst, the court explained that Medina "must be quiet and talk quietly with his lawyers," that Medina "must not address the Judge unless the Judge first addresses him," and that there were to be no further outbursts or Medina would be secluded from the trial. Medina protested that to exclude him from the trial would be illegal because he had a legal right to be present, apologized to the court, told the court that he thought he could behave himself, got angry again when the court refused to allow a spectator to speak to him, but remained silent after the jury panel returned.

(4) While the court was announcing the names of the jury, Medina spoke loudly with his attorney concerning the jurors he wanted, was reprimanded by the court, and apologized.

(5) After the jury was selected, instructed, and excused for lunch, Medina asked the court for

permission to speak and inquired about his right to pick the jury. The court explained that his right to exclude ten jurors had been exercised by his lawyer. Despite initial confusion by Medina, the incident concluded when Medina indicated that he understood.

(6) On the second morning of trial, the court twice asked counsel to advise Medina to talk more quietly and suggested that it would in Medina's best interest not to misbehave.

(7) Following a short recess to loosen Medina's handcuffs, the court advised Medina that it would be to his advantage to keep his hands still and not play with his handcuffs. Medina responded that he wanted to write down what the witness was saying and requested that his right hand be freed so he could write. Medina accepted the court's denial of his request.

9. The competency issues included: (1) whether events, both pretrial and trial, raised doubts about Medina's competence to stand trial; (2) whether counsel rendered ineffective assistance by failing to investigate Medina's mental health; (3) whether Medina received incompetent mental health assistance; and (4) whether Medina was competent to stand trial and capital sentencing.

Medina's mental health. Three mental health experts testified that Medina was psychotic. Dr. Joyce Carbonell, who met and evaluated Medina in September 1988, and Dr. Dorita Marina, who met and evaluated Medina in June and July 1987, are clinical psychologists who based their evaluations on various psychological tests and defense records, as well as on interviews with Medina. Dr. Marina believed that Medina suffered from paranoid schizophrenia. Dr. Stephen Teich, who met and evaluated Medina in the fall of 1988, is a forensic psychiatrist who based his evaluation primarily on an interview with Medina but also reviewed defense records to answer questions he had after the interview. Dr. Teich believed Medina's psychosis was based on depression but he was unable to rule out schizophrenia.

At the hearing, the mental health experts were not allowed to testify as to Medina's competence to stand trial because that issue had previously been found to be without merit. Medina, however, proffered the written report of Dr. Marina. After detailing the materials which she used in evaluating Medina, reviewing his background, and stating her observations and the results and interpretations of the various tests she administered, she stated her conclusions and recommendations. Specifically in regard to his competence to stand trial, she stated: "It appears that though this individual had a factual understanding of the charges against him, he lacked a rational ability to aid counsel in his defense. . . . There is a substantial probability that this individual was incompetent to stand trial at the time his trial was held." She further stated: "In my professional opinion, Mr. Medina was and is incompetent to stand trial under the criteria of Fla.R.Crim.P. 3.211."

The trial court denied the Rule 3.850 motion. The Florida Supreme Court agreed, finding that the competency issues were "procedurally barred because they, or variations of them, had been raised on direct appeal," and affirmed the trial court's denial of the motion. *Medina v. State,* 573 So.2d 293, 294–95 (Fla.1990).

In his state petition for a writ of habeas corpus, Medina again raised several competency issues.[10] Medina admitted that "he raised his competency . . . issues on direct appeal and in his motion for postconviction relief." *Medina v. Dugger,* 586 So.2d 317, 318 (Fla.1991). The court found that the competency issues were procedurally barred. *Id.*

In his federal petition for a writ of habeas corpus, Medina alleged that he was incompetent and was convicted and sentenced in violation of his constitutional rights when the trial court "refused to conduct a competency hearing during trial, refused to appoint a mental health expert, and accepted professionally inadequate mental evaluations over the objection of counsel." In support of his competency claims, Medina pointed to the mental health evidence from his Rule 3.850 hearing. The district court found that "all of the issues raised in [his competency] claim, except the issue regarding the appointment of a third expert, are procedurally barred" because the Florida Supreme Court had determined that the claims were procedurally defaulted. The district court also found that Medina had not shown cause or prejudice that would excuse the default and that the record would not support "either prong of the cause/prejudice two-prong test."

Alternatively, the district court found that the competency issues were without merit. Noting that "[t]he report of Dr. Marina does not unequivocally and clearly generate a legitimate doubt as to [Medina's] competency to stand trial," the district court found that Medina "failed to generate a real, substantial and legitimate doubt as to his competence to stand trial." The district court also found that, as required by Florida law, the trial court appointed two experts and "there is no indication that the appointed experts performed an inadequate investigation."

---

**10.** The competency issues included: (1) whether the trial court erred in failing to conduct a competency hearing during trial; (2) whether the court erred in refusing to grant counsel's request for a third mental health evaluation; (3) whether Medina was deprived of a competent mental health evaluation; (4) whether Medina was incompetent to stand trial; and (5) whether Medina was denied a meaningful and individualized capital sentencing by the court's refusal to appoint a third mental health expert.

### 4. *Analysis and holding.*

On direct appeal, Medina raised only one competency claim: that he was entitled to evaluation by a third mental health expert. He did not raise his procedural competency claim that he was entitled to a *Pate* hearing during the trial. Although the *Pate* claim was raised by Medina in his Rule 3.850 motion and in his state habeas petition, the Florida Supreme Court held that the claim was procedurally defaulted because it could have been raised on direct appeal and was not. Medina has not shown cause for the procedural default, and we are therefore prohibited, under *Sykes,* from considering the merits of Medina's procedural due process claim that a second competency hearing should have been held during trial.

Medina did not raise, on direct appeal, his substantive competency claim that he was tried while incompetent. His substantive claim, however, is not subject to procedural default and must be considered on the merits. We hold that he has not presented clear and convincing evidence creating a real, substantial, and legitimate doubt as to his competence to stand trial, that he is not entitled to an evidentiary hearing, and that his substantive competency claim is without merit.

The trial court's finding that Medina was competent to stand trial is presumed to be correct and may not be overturned if it is fairly supported by the record. The trial court had reports from two independent psychiatrists finding that Medina was competent to stand trial. The trial court also heard testimony from Medina himself. Medina spoke rationally and with understanding, describing his background as well as the educational activities in which he had participated while in jail. Although there was evidence that Medina had experienced mental problems in the past, both in Cuba and in jail, this evidence did not support a finding that Medina was incompetent at the time of the competency hearing. The trial court's finding of competence is fairly supported by the record before the court at the time of the decision.

To show entitlement to an evidentiary hearing on his postconviction claim of incompetence, Medina must present evidence that "positively, unequivocally, and clearly" generates legitimate doubt as to his competence at the time of his trial. *Card,* 981 F.2d at 484. Medina alleges that the requisite doubt is created by evidence of his behavior during trial, by evidence from three mental health experts who testified at his Rule 3.850 hearing, and by evidence that the two pretrial mental health evaluations were professionally inadequate.

Medina did, at times, misbehave during his trial. He also responded appropriately to the court's reprimands, behaved appropriately during much of the trial, and testified coherently and rationally on his own behalf.

Neither Dr. Carbonell nor Dr. Teich testified as to Medina's competence to stand trial. Dr. Marina did state in her report that she believed Medina was incompetent to stand trial. Her evaluation, however, conducted four years after Medina's trial, is in direct contradiction to the evaluations performed by Drs. Gonzalez and Wilder shortly before Medina's trial. Further, while acknowledging that she had seen the two psychiatrists' reports, Dr. Marina refused to state that the reports were wrong.[11] She also indicated that Medina was not psychotic all the time but had periods when he was lucid and related to others and that he had a factual understanding of the charges against him.

Medina has presented no evidence to show that the evaluations by Drs. Gonzalez and Wilder were professionally inadequate. None of the mental health experts who testified at the Rule 3.850 hearing suggested that

---

11. In fact, Dr. Marina specifically admitted that professionals may disagree in their interpretations. *See also Ake,* 470 U.S. at 80–81, 105 S.Ct. at 1095 ("Psychiatry is not, however, an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness."); *Waye v. Murray,* 884 F.2d 765, 767 (4th Cir.) ("It will nearly always be possible in cases involving the basic human emotions to find one expert witness who disagrees with another and to procure an affidavit to that effect from the second prospective witness."), *cert. denied,* 492 U.S. 936, 110 S.Ct. 29, 106 L.Ed.2d 634 (1989).

the evaluations were inadequate, although all had reviewed the evaluations and considered them along with other information in reaching their own conclusions. Even when specifically asked if the psychiatric reports were wrong, Dr. Marina replied "I do not know about psychiatrists." Medina suggests the evaluations performed by Drs. Gonzalez and Wilder were inadequate because the psychiatrists relied solely on a self report by Medina, did no testing, were provided no background material, provided no diagnosis, and did not individually discuss the competency criteria. Both reports discussed the background information provided by Medina during the interview; both stated that Medina was hospitalized in Cuba at a mental hospital; both itemized the statutory competency criteria and specifically stated that Medina met them. Although neither psychiatrist stated a diagnosis, there was no reason for either to do so because (1) they were not asked to "diagnose" Medina and (2) they found that Medina was both competent to stand trial and competent at the time of the alleged offense. Further, Dr. Wilder specifically stated that Medina's "impaired" fund of general information was not the result of any mental illness. Finally, Medina fails to appreciate the difference between psychological evaluations and psychiatric evaluations and the different methods used by the two professions: psychologists perform and rely upon the results of psychological tests; psychiatrists do not, although they may consider tests performed by others along with other information in reaching their conclusions as did Dr. Teich.[12]

The evidence fails to meet the high standard required for an evidentiary hearing on the postconviction claim of incompetence in that it does not "positively, unequivocally, and clearly" generate doubt as to Medina's competence to stand trial.[13] *Card*, 981 F.2d at 484. The district court did not err in determining that Medina "failed to generate a real, substantive and legitimate doubt as to his competence to stand trial." He is not entitled to an evidentiary hearing and his substantive competency claim is without merit.

### C. The "Heinous, Atrocious, or Cruel" Aggravating Factor Claim

#### 1. Parties' positions.

Medina alleges that Florida's "heinous, atrocious, or cruel" aggravating factor is vague and overbroad and that the vagueness and overbreadth were not cured by a limiting instruction to the jury during sentencing.

The state responds that Medina never presented this claim to the state courts, that the state courts would find that the claim is procedurally barred because Medina did not propose a limiting instruction and did not object to the instruction which was given to the jury, and that the claim is therefore procedurally defaulted for federal habeas purposes.

#### 2. Legal standard.

 The Eighth Amendment requires that a capital sentencer's discretion be channelled and limited so as to minimize the risk of imposing the death penalty in a wholly arbitrary and capricious manner. *See Maynard v. Cartwright*, 486 U.S. 356, 361–62, 108

---

12. Dr. Teich indicated that he reviewed most of the records on Medina after he had conducted his interview. He stated that he did not need to go beyond Medina's self report during the interview to determine Medina's "mental status," which he defined as "my observation of how I think he is functioning and my observations at the time, and it's a description." He indicated, however, that he needed more information to reach a diagnosis, to determine whether Medina was mentally ill.

13. Medina argues that this Court found "the requisite level of doubt" in *James* under similar circumstances and ordered an evidentiary hearing. The facts of this case, however, differ significantly from those in *James*. In *James*, the issue of James' competence was never raised until after he was convicted; "no state court ... ever made findings of historical facts underlying a determination of competency;" and "no state court ... found [James] to have been competent to stand trial." *James*, 957 F.2d at 1574. Medina, in contrast, raised the issue of his competence several months before trial; he was evaluated by two psychiatrists, both of whom found him competent to stand trial; the trial court held a competency hearing during which various types of evidence were presented; and the trial court specifically found Medina competent to stand trial on the day before the trial began.

S.Ct. 1853, 1858, 100 L.Ed.2d 372 (1988). Instructions that permit imposition of the death penalty upon a finding that the murder was "especially wicked, evil, atrocious, or cruel," must be accompanied by further instruction narrowing the jury's discretion. *See Stringer v. Black,* 503 U.S. 222, 227–28, 112 S.Ct. 1130, 1135, 117 L.Ed.2d 367 (1992); *Espinosa v. Florida,* —— U.S. ——, ——, 112 S.Ct. 2926, 2928, 120 L.Ed.2d 854 (1992).

■■■■■ In Florida, a capital defendant who does not challenge the "heinous, atrocious, or cruel" instruction "either by submitting a limiting instruction or making an objection to the instruction as worded ... is procedurally barred from complaining of the erroneous instruction." *Beltran–Lopez v. State,* 626 So.2d 163, 164 (Fla.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2122, 128 L.Ed.2d 678 (1994). *See also, Hardwick v. Dugger,* 648 So.2d 100 (Fla.1994). Even a pretrial motion objecting to the vagueness of the "heinous, atrocious, or cruel" factor is not sufficient to preserve an objection to the instruction if the party did not object after the court instructed the jury and did not make an advance request for a specific instruction. *Sochor v. Florida,* 504 U.S. 527, 534 n. **, 112 S.Ct. 2114, 2120 n. **, 119 L.Ed.2d 326 (1992) (citing, among others, *Harris v. State,* 438 So.2d 787, 795 (Fla. 1983), *cert. denied,* 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 563 (1984)).

■■■ If a state prisoner "fail[s] to exhaust state remedies and the court to which [he] would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, ... there is a procedural default for purposes of federal habeas," *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991), and the federal habeas court is precluded from hearing the merits of the claim, absent a showing of cause and prejudice, *Wainwright v. Sykes,* 433 U.S. 72, 86–87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977).

### 3. *Factual and procedural background.*

Before his trial began, Medina filed a motion to declare Fla.Stat. § 921.141[14] unconstitutional. Medina argued that the section of the statute enumerating the aggravating and mitigating circumstances was vague and overbroad. Specifically, Medina argued that the "heinous, atrocious, or cruel" aggravating factor was overbroad because "[a]lmost any capital felony would appear especially cruel, heinous and atrocious to the layman." The motion was denied.

During the charge conference for the sentencing portion of Medina's trial, the state requested the "especially wicked, evil, atrocious, or cruel" charge. Although counsel for Medina objected to including the instruction because this murder was no more "atrocious or cruel than any other first degree murder," she did not object to the wording of the instruction and did not suggest a limiting instruction. The court instructed the jurors that they should consider "whether the crime for which the defendant is to be sentenced was especially wicked, evil, atrocious, or cruel." After the jury left the courtroom to deliberate, the court asked, "Does counsel approve of the instructions and the advisory sentence form?" Counsel for Medina replied, "Yes, sir." At no time during trial, either during the charge conference or after the charge was given, did Medina offer a limiting instruction on the "heinous, atrocious, or cruel" aggravating factor or object to the constitutionality of the instruction as given.

On direct appeal to the Florida Supreme Court, Medina argued that the trial court erred in denying his motion to declare Fla. Stat. § 921.141 unconstitutional. Medina also argued that the statute was vague and overbroad. Medina did not, however, attack the specific instruction given to the jury. Citing *Peavy v. State,* 442 So.2d 200 (Fla.

---

**14.** Section 921.141 is one of Florida's death penalty statutes. In addition to providing for separate sentencing proceedings, defining the roles of the jury and the judge, and providing for automatic review by the Florida Supreme Court, the statute defines aggravating and mitigating circumstances. Fla.Stat. § 921.141 (1993). At issue here is the provision that one aggravating factor to be considered is whether "[t]he capital felony was especially heinous, atrocious, or cruel." Fla.Stat. § 921.141(5)(h).

1983), the Florida Supreme Court found that the issue of the constitutionality of the Fla. Stat. § 921.141 had previously been decided against Medina's contentions. *Medina v. State,* 466 So.2d 1046, 1048 n. 2 (Fla.1985).

In his federal petition for a writ of habeas corpus, Medina objected to application of the "heinous, atrocious, or cruel" aggravating factor because "the facts and law do not support a finding that the death occurred in a heinous, atrocious or cruel manner." He supported this allegation by suggesting that the "error was compounded when the jury instructions failed to limit the jury's discretion."

4. *Analysis and holding.*

■ The trial court instructed the jury with the language rejected by the Supreme Court in *Espinosa,* and the jury was not provided any narrowing instructions. Medina, however, never requested a limiting instruction. In fact, Medina's counsel specifically approved the instructions given to the jury. Medina never raised the issue of a limiting instruction on direct appeal, in his Rule 3.850 motion for postconviction relief, or in his state habeas petition.

Although this issue was not addressed in the state courts, we hold that it would be procedurally barred because Medina did not request a limiting instruction and did not object to the instruction as given. The claim is therefore procedurally defaulted for purposes of federal habeas corpus and, as Medina failed to even suggest any cause or prejudice, this Court is precluded from addressing the merits of the claim.

III. CONCLUSION

None of Medina's claims warrants relief. The district court did not err in denying his petition for a writ of habeas corpus.

AFFIRMED.