UNITED STATES, Appellee

v.

Gustavo A. DELAROSA, Aviation Ordnanceman Third Class
U.S. Navy, Appellant

No. 08-0390

Crim. App. No. 200602335

United States Court of Appeals for the Armed Forces

Argued February 3, 2009

Decided May 6, 2009

EFFRON, C.J., delivered the opinion of the Court, in which
BAKER, STUCKY, and RYAN, JJ., joined. ERDMANN, J., filed a
dissenting opinion.

Counsel

For Appellant: Lieutenant Brian D. Korn, JAGC, USN (argued);
Major Richard D. Belliss, USMC.


For Appellee: Major Elizabeth A. Harvey, USMC (argued); Brian
K. Keller, Esq. (on brief); Lieutenant Derek D. Butler, JAGC,
USN.


Amicus Curiae: Preston Jones (law student) (argued); Brook A.
Busbee, Esq. (supervising attorney) (on brief); Mike McCollum,
Esq. (supervising attorney); for the Southern Methodist
University, Dedman School of Law.


Military Judge: Daniel E. O'Toole

THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

United States v. Delarosa, No. 08-0390/NA

Chief Judge EFFRON delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of aggravated assault on his infant son, in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928 (2000). The sentence adjudged by the court-martial and approved by the convening authority included a bad-conduct discharge, confinement for three months, forfeiture of all pay and allowances, and reduction to pay grade E-1. The United States Navy-Marine Corps Court of Criminal Appeals affirmed. United States v. Delarosa, No. NMCCA 200602335, 2008 CCA LEXIS 4, at *20, 2008 WL 142115, at *7 (N-M. Ct. Crim. App. Jan. 10, 2008) (unpublished).

The present appeal concerns the ruling of the military judge denying Appellant's motion to suppress his confession to local civilian law enforcement officers.[1] For the reasons set

---

[1] On Appellant's petition, we granted review of the following issue:

> WHETHER (1) THE LOWER COURT ERRED IN ADOPTING A TEST TO DETERMINE WHETHER APPELLANT'S ASSERTION OF HIS RIGHT TO REMAIN SILENT WAS SCRUPULOUSLY HONORED THAT DIFFERS FROM THE TESTS SET FORTH BY THE UNITED STATES SUPREME COURT IN MICHIGAN v. MOSLEY, 423 U.S. 96 (1975) AND UNITED STATES v. WATKINS, 34 M.J. 344 (C.M.A. 1992); AND (2) WHETHER THE LOWER COURT ERRED IN HOLDING THAT THE MILITARY JUDGE CORRECTLY DENIED THE DEFENSE MOTION TO SUPPRESS APPELLANT'S

2

United States v. Delarosa, No. 08-0390/NA

forth below, we agree that the military judge properly denied

the suppression motion, and we affirm Appellant's conviction.[2]

## I.   BACKGROUND

### A.   SELF-INCRIMINATION RIGHTS WARNINGS
### FOR PERSONS IN CUSTODY

Prior to initiating interrogation, law enforcement

officials must provide rights warnings to a person in custody.

See Miranda v. Arizona, 384 U.S. 436, 445 (1966); United States

v. Tempia, 16 C.M.A 629, 637, 37 C.M.R. 249, 257 (1967); U.S.

Const. amend V.  Military officials and civilians acting on

their behalf are required to provide rights warnings prior to

interrogating a member of the armed forces if that servicemember

is a suspect, irrespective of custody.  Article 31(b), UCMJ, 10

U.S.C. 831(b) (2000); Military Rule of Evidence (M.R.E.)

305(b)(1), 305(c).  The present appeal involves only the former

requirement -- rights warnings under Miranda for persons in

custody.

When Miranda warnings are required, the person must be

_____

CONFESSION MADE TO THE DETECTIVES AT THE
NORFOLK, VIRGINIA, POLICE DEPARTMENT.

[2] Oral argument in this case was heard at the Dedman School of
Law, Southern Methodist University, Dallas, Texas, as part of
the Court's "Project Outreach."  See United States v. Mahoney,
58 M.J. 346, 347 n.1 (C.A.A.F. 2003).  This practice was
developed as part of a public awareness program to demonstrate
the operation of a federal court of appeals and the military
justice system.

advised of the right to remain silent, that any statement made by the person can be used against that person in a court of law, that the person has the right to consult with counsel and have counsel present during questioning, and that counsel will be appointed if the person cannot afford a lawyer. 348 U.S. at 444. If a suspect provides an ambiguous statement regarding invocation of rights after Miranda warnings have been given, law enforcement officials are not obligated to cease interrogation. See Davis v. United States, 512 U.S. 452, 461-62 (1994); Medina v. Singletary, 59 F.3d 1095, 1101 (11th Cir. 1995); cf. United States v. Acosta, 363 F.3d 1141, 1152 (11th Cir. 2004) (applying Davis when the appellant told the police that he would make a statement but refused to sign a rights waiver form). If a suspect's statement is ambiguous, law enforcement officials may attempt to clarify the issue of rights invocation, but they are not required to do so. Davis, 512 U.S. at 461 (noting that although "it will often be good police practice for the interviewing officers to clarify" an ambiguous response, the Supreme Court "decline[d] to adopt a rule requiring officers to ask clarifying questions"). See, e.g., United States v. Brown, 287 F.3d 965, 972-73 (10th Cir. 2002) (applying Davis to ambiguous initial waiver); United States v. Muhammad, 120 F.3d 688, 698 (7th Cir. 1997) (same). But see United States v. Rodriguez, 518 F.3d 1072, 1079-80 (9th Cir. 2008) (viewing Davis

4

as applicable only in a post-waiver context, and requiring an "interrogating officer to clarify any ambiguity before beginning general interrogation"). They may continue questioning unless the suspect unambiguously invokes his rights, regardless of whether law enforcement officials have endeavored to clarify any ambiguity. Davis, 512 U.S. at 461-62.

If the suspect unambiguously invokes his or her rights under Miranda, law enforcement officials may not conduct any further questioning of the suspect about the offense unless they do so in a manner demonstrating that they have "scrupulously honored" the suspect's invocation of rights. Michigan v. Mosley, 423 U.S. 96, 104 (1975); cf. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981) (holding that a suspect who invokes the right to counsel could not be subjected to further interrogation until counsel has been made available to him, unless the suspect himself reinitiated further communication with the police).

In the present appeal, the parties do not dispute that Appellant received the appropriate warnings under Miranda. In that context, the issues on appeal concern whether Appellant unambiguously invoked his Miranda rights; and, if so, whether the law enforcement officials scrupulously honored those rights before conducting any further interrogation.

### B.   THE SUPPRESSION MOTION

1.  Procedural setting

Appellant lived in an off-base apartment in Norfolk, Virginia, with his wife and five-month-old son.  On the evening of January 20, 2004, paramedics came to the apartment in response to an emergency call from Appellant's wife.  They found Appellant performing CPR on his son, who was unconscious and not breathing.  An ambulance brought the child to a civilian hospital in a condition of full cardiac arrest.  The initial medical diagnosis indicated that the son was a victim of child abuse in the form of shaken baby syndrome.  Early in the morning on January 21, the son was transferred to the pediatric intensive care unit.  On January 22, after doctors determined that the condition was irreversible, the child was removed from life support and was declared legally dead.  Following an autopsy conducted by civilian medical officials on January 23, the Norfolk medical examiner issued a report describing the cause of death as an acute head injury.

Later that day, civilian law enforcement officials in Norfolk opened a homicide investigation, which was conducted primarily by Detectives Bynum and Mayer of the Norfolk Police Department.  During the investigation, Appellant made the incriminating statements at issue in the present appeal.  See infra Part I.B.2.  Subsequently, Appellant was charged with

murder under state law, and the case was referred for trial before the Juvenile and Domestic Relations Court of the City of Norfolk, Criminal Division.  At a preliminary hearing, the presiding judge suppressed Appellant's incriminating statements on the ground that the officers did not "scrupulously guard[]" his Miranda rights by putting Appellant in "the position of having to justify the exercise of a constitutional right."  The judge then dismissed the charge based on insufficiency of the remaining evidence.

Military officials instituted separate proceedings under the UCMJ the following year, leading to the court-martial that is the subject of the present appeal.  We note that the constitutional and statutory limitations on former jeopardy are not at issue when, as in the present case, charges are pursued in a federal proceeding -- a court-martial -- after dismissal in state court.  See U.S. Const. amend. V; Article 44, UCMJ, 10 U.S.C. § 844; Heath v. Alabama, 474 U.S. 82, 89 (1985) (holding that the federal and state governments, for purposes of former jeopardy, are treated as separate sovereigns, in which criminal proceedings by one sovereign do not preclude proceedings by the other).

At the court-martial, the prosecution sought a preliminary ruling on the admissibility of Appellant's confession, and the defense responded with a motion to suppress.  After the parties

7

presented extensive testimony and documentary evidence in a preliminary session under Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), the military judge denied Appellant's motion to suppress the confession.  At the request of the defense, the military judge reconsidered the matter but declined to change his ruling.  The military judge made detailed findings of fact and conclusions of law regarding the actions of the civilian law enforcement officials in obtaining incriminating statements from Appellant.  See infra Part I.B.2.

At trial, the prosecution included the incriminating statements as part of its case-in-chief before the court-martial panel.  A panel of members convicted Appellant, and the Court of Criminal Appeals affirmed.

On appeal of a motion to suppress incriminating statements, we "accept[] the military judge's findings of historical fact unless they are clearly erroneous," and we review the military judge's conclusions of law de novo.  See United States v. Melanson, 53 M.J. 1, 2 (C.A.A.F. 2000).  In the present appeal, neither party challenges the military judge's findings of fact, but they disagree as to the conclusions of law.  See infra Part III.  In that posture, we accept the military judge's factual findings as described in the following section.

2.  Findings of fact by the military judge

The following summarizes the military judge's findings of

fact pertinent to the present appeal.

a.  Appellant's appearance at the police station

Detective Bynum of the Norfolk Police Department contacted Appellant on the afternoon of January 23, 2004 -- the day after his son died -- and asked him to come to the Police Operations Center to identify his son's body.  That afternoon, Appellant drove to the Police Operations Center in his own vehicle. Detective Bynum met Appellant in the reception area at about 3:00 p.m. and escorted him through two sets of locked doors into an interview room.  Appellant was not placed in handcuffs, nor was he told he was under arrest.

b.  Appellant's stated interest in discussing the incident with the detectives

The detectives and Appellant engaged in about forty minutes of general conversation before Appellant was presented with the body identification form.  During this time, Appellant was responsive and cooperative.  Appellant told the detectives that the medical examiner's office had informed him that the death had been determined to be a homicide.  Appellant indicated several times that he wanted to discuss his son's death with the detectives.  He told the detectives that he wanted to "tell you what you want to know."  The detectives, however, advised Appellant that they would not talk about the homicide until they completed the body identification form and advised Appellant of

his rights.  Shortly thereafter, Appellant signed the body identification form.

####    c.   The rights advisement

At about 3:50 p.m., Detective Bynum advised Appellant of his Miranda rights using the Norfolk Police Department Legal Rights Advice Form.  The form consisted of seven items with blank space after each item for Appellant's response.  The first four items set forth the Miranda rights, with each item containing a question asking whether Appellant understood the applicable right.  The fifth item contained a summary statement regarding Appellant's understanding of the rights warnings.  The sixth item provided an opportunity to waive the rights, and the last item addressed the issue of voluntariness.

Detective Bynum employed a sequential procedure in connection with the form.  First, he read each item.  Then, he asked Appellant to read the item aloud and explain what it meant in Appellant's own words.  Finally, he asked Appellant to write his response on the form.

####    d.   Appellant's response to the rights advisement

The first item on the form concerned the right to remain silent.  Detective Bynum read the item.  Then Appellant read it, explained it, and wrote "YES," indicating that he understood the right.

As Detective Bynum attempted to employ the same procedure

on the remaining items, Appellant repeatedly interrupted him. During these interruptions, Appellant stated a number of times that he wanted to talk to the detectives. Detective Bynum attempted to slow down the process and complete the form in the usual manner.

Appellant indicated that he understood the rights described on the form by writing "YES" after each of the first five items. However, after the sixth item -- "I further state that I waive these rights and desire to make a statement" -- Appellant wrote "NO" as his response. After the seventh item -- "This statement is completely free and voluntary on my part without any threat or promise from anyone" -- Appellant wrote "N/A" as his response.

At that point, Detective Bynum did not know whether Appellant had misunderstood the sixth item or whether Appellant wished to invoke the right to remain silent. Both detectives were surprised and confused by Appellant's answer. Attempting to clarify the matter, Detective Bynum asked Appellant, "'Why did you say "NO"?'" Appellant responded that he wanted to talk to the detectives, but that he also wanted a command representative present. Detective Bynum responded that the standard policy of the Norfolk Police Department did not allow anyone to be present during questioning other than the subject, but he noted that Appellant had the right to counsel and pointed

11

out the third item on the rights advisement form.  Appellant did not request counsel, but repeated his request for the presence of a command representative.

Detective Bynum reiterated that the department's policy would not permit the presence of a command representative.  He then told Appellant that the detectives would leave the room and provide Appellant with additional time to review the rights advisement form.  Detective Bynum advised Appellant to knock on the interrogation room door when he came to a decision.

As the detectives departed, Appellant offered a comment about the incident under investigation, stating that his son was alone with the babysitter for about two hours the day he was rushed to the hospital.  The detectives did not respond or otherwise engage Appellant in substantive discussion about his son's death.  They left the room and closed the door.

e.  The waiver

At 4:25 p.m., approximately thirty-five minutes after the detectives left the interview room, Detective Mayer returned and asked if Appellant would be willing to take a polygraph examination.  When Appellant answered "Yes," Detective Mayer responded that he would make the arrangements.

Detective Mayer again checked in with Appellant at 6:35 p.m., asking whether Appellant needed anything.  When Appellant asked to use the restroom, Mayer escorted him through two

secured doors to the restroom area. Mayer waited outside while Appellant used the restroom.

Upon exiting the restroom, Appellant asked Detective Mayer if he could make a telephone call. Mayer responded that Appellant could do so but that he would have to wait a while because Mayer was in the middle of something else. In response to Appellant's inquiry as to what the detective was doing, Mayer stated that Appellant's wife was in an interview room preparing for a polygraph test. Mayer stated that he would arrange for Appellant to use the telephone as soon as he was done with Appellant's wife.

After learning that his wife was undergoing a polygraph examination, Appellant indicated that he wanted to speak with the detectives about his son's death. Detective Mayer responded that the detectives could not speak with Appellant because he had written "NO" on the rights advisement form. Appellant stated that he had been confused about the rights form and that he now wanted to waive his rights and take a polygraph examination. Mayer told Appellant that he and Detective Bynum would have to advise Appellant of his rights using a new rights advisement form before being able to speak with Appellant. Mayer added that the detectives would return to Appellant's interview room as soon as Appellant's wife finished her polygraph examination.

At 6:56 p.m., Detective Bynum and Detective Mayer reentered Appellant's interview room. They advised Appellant of his Miranda rights using a second rights advisement form. This time, Appellant wrote "YES" next to each item on the form, including the item indicating that Appellant agreed to waive his rights and make a statement to the police.

At 8:00 p.m., Appellant participated in a polygraph examination administered by a third detective, Detective Crank. Before answering substantive questions, Appellant read and signed a third rights advisement form in which he again waived his rights. Appellant also responded verbally that he understood his rights and that he consented to take the polygraph examination as a matter of his own free will. During the pre-polygraph interview, Appellant continued to deny any involvement in his son's death.

f. Appellant's incriminating statements

During the post-polygraph interview, Appellant broke down crying after Detective Crank acknowledged that Appellant loved his son. Appellant proceeded to make several incriminating verbal responses to both leading and open-ended questions posed by Detective Crank.

Appellant returned to the interview room at 9:28 p.m. In response to questioning from Detective Mayer and Detective Bynum during a tape-recorded session, Appellant made additional and

more detailed incriminating statements. The tape-recorded statements were transcribed, and Appellant signed a typed statement at 11:58 p.m.

The incriminating statements included admissions that, on the night his son was rushed to the hospital in cardiac arrest, Appellant had shaken his son after becoming frustrated when his son refused to stop crying and go to sleep. Appellant also admitted to shaking his son again a few hours later as Appellant tried to wake him up to feed him.

g. The military judge's additional findings of fact

After the military judge issued his initial findings of fact and denied the motion to suppress, the defense asked the military judge to reconsider the matter and permit the accused to testify on the suppression motion. See M.R.E. 304(f). The military judge granted the motion, and Appellant testified that he asked for a lawyer and intended to invoke his Miranda rights during the first rights advisement. Appellant also testified that, during the time Detective Mayer was escorting Appellant to the restroom, Mayer pressured Appellant into waiving his rights and Appellant felt he did not have a choice but to agree.

The military judge issued additional findings of fact in which he found that Appellant's testimony on the suppression issue was not credible. The military judge concluded that Appellant's testimony did not require revision of the previously

adjudicated findings of fact.  We note that the parties have not challenged the military judge's findings of fact as clearly erroneous, see supra Part B.1., and we have not identified a basis for concluding that the findings were clearly erroneous. Accordingly, we assess the issues of law based upon the military judge's findings of fact.

## II.  DISCUSSION

At the outset, we consider whether Appellant unambiguously invoked his Miranda rights.  If Appellant made an unambiguous invocation of his rights, law enforcement officials were obligated to scrupulously honor his invocation before engaging in any further discussion regarding waiver.  See Davis, 512 U.S. at 459, 461-62.  If, however, Appellant did not unambiguously invoke his rights, law enforcement officials had "no obligation to stop questioning him."  Id. at 462.  If Appellant did not unambiguously invoke his rights, permissible questioning could include clarification of ambiguities.  As the Supreme Court has stated, "it will often be good police practice for the interviewing officers to clarify" an ambiguous response.  Id. at 461 (noting that the Court "decline[d] to adopt a rule requiring officers to ask clarifying questions").  See supra Part I.A.

## A.  INVOCATION AND WAIVER

In assessing whether a person provided an unambiguous

16

invocation of Miranda rights, the Supreme Court has stated that the invocation must be "sufficiently clear[] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney" or to remain silent. Davis, 512 U.S. at 459. The Supreme Court has addressed without resolving the question of whether an invocation "may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself." Smith v. Illinois, 469 U.S. 91, 99-100 (1984). The courts of appeals have considered events immediately preceding, as well as concurrent with, the invocation in the course of addressing the issue of ambiguity. See United States v. Abela, 380 F.3d 915, 926 (6th Cir. 2004) (finding it appropriate for a reviewing court to look to the surrounding circumstances to evaluate the clarity of a suspect's request for counsel); Acosta, 363 F.3d at 1154-55 (holding that the appellant's rights invocation was ambiguous after considering that the appellant stated that he was willing to speak to the police while also stating that he would not waive his rights); Bui v. DiPaolo, 170 F.3d 232, 241 (1st Cir. 1999) (holding that the appellant's invocation was ambiguous when the statement that he did not want to talk about the reasons for his arrest was preceded by and concurrent with a back-and-forth exchange with the police); Medina, 59 F.3d at 1101; cf. Rodriguez, 518 F.3d at 1077

17

(holding that the appellant's phrase "I'm good for tonight" constituted an ambiguous invocation of his right to silence after examining the nuances of the language).

The Court of Criminal Appeals treated Appellant's insertion of the word "NO" next to the rights-waiver question on the form as an ambiguous invocation of rights in the context of the surrounding events.  The court then stated:  "[O]nce the appellant made clear that his willingness to make a statement was contingent on having a command representative present, the ambiguity [surrounding his invocation of rights] was resolved."  Delarosa, 2008 CCA LEXIS 4, at *12, 2008 WL 142115, at *4.  The court next engaged in a detailed examination of whether the further actions by the detectives "scrupulously honored" Appellant's invocation of rights under Mosely, 423 U.S. 96.  The court concluded that the detectives complied with Mosely, and held that Appellant's incriminating statements were admissible.  Delarosa, 2008 CCA LEXIS 4 at *12-*19, 2008 WL 142115, at *4-*7.

To the extent that the court below concluded that Appellant unambiguously invoked his Miranda rights, we disagree.  The interaction between Appellant and the detectives during the period from the initial rights advisement through Appellant's decision to waive his Miranda rights -- as reflected in the findings of fact by the military judge -- underscores the ambiguous nature of Appellant's pre-waiver responses.  See supra

Part II.B.2.

Immediately before the initial rights advisement, Appellant indicated several times that he wanted to discuss his son's death with the detectives. Likewise, in the midst of the rights advisement, Appellant repeatedly interrupted Detective Bynum, stating a number of times that he wanted to talk to the detectives. In light of Appellant's repeated statements reflecting an intent to cooperate, Appellant's "NO" response on the rights advisement form was ambiguous.

Immediately after Appellant wrote "NO" in response to the question of whether he would waive his rights, Detective Bynum attempted to clarify Appellant's response. Appellant said he would talk to the detectives with a command representative present, a request that the detectives declined to grant. When the detectives said that they would leave the room to give him additional time to consider the issue of waiver, Appellant highlighted the ambiguity of his request for a command representative by initiating a conversation containing a potentially exculpatory comment about babysitting arrangements for his son on the date of the injury. Under these circumstances, the detectives reasonably treated Appellant's responses as ambiguous.[3]

---

[3] We note that Appellant later stated that he had written "NO" on the first form because he was confused about the form and he now

19

Throughout the process, the detectives continued to pursue clarification of his intent until they obtained an affirmative waiver of his Miranda rights. See Davis, 512 U.S. at 461-62. Considering the circumstances prior to and during Appellant's writing "NO" on the rights advisement form, it was reasonable for the detectives to view Appellant's actions as a whole as ambiguous with respect to invocation of the right to remain silent. See Medina, 59 F.3d at 1104-05 (declining to adopt a per se rule that a suspect's response of "No" when asked if he wants to talk to a police officer means the officer cannot go forward with questioning). Likewise, when Appellant initiated a conversation containing a potentially exculpatory comment immediately after requesting the presence of a command representative, the detectives reasonably treated his actions as ambiguous with respect to invocation of the right to remain silent. Under these circumstances, the detectives were not required to cease questioning Appellant, and they were likewise free to resume questioning at any time. Davis, 512 U.S. at 461-62; Medina, 59 F.3d at 1105.

---

wanted to waive his rights. Although Appellant's subsequent statements form no part of our analysis on the issue of ambiguity, see Smith, 469 U.S. at 100, we note that Appellant's subsequent statements confirm our conclusion that Appellant's responses were ambiguous.

## B.   VOLUNTARINESS

Although Appellant focuses primarily on the issue of waiver, he also offers a brief challenge to the voluntariness of his admissions.  See M.R.E. 304(c)(3).  After reviewing the totality of the circumstances, we also find that Appellant's confession was "voluntarily, knowingly, and intelligently" given.  See Miranda, 384 U.S. at 444.  Appellant was advised of his Fifth Amendment rights from a standardized legal rights advisement form on three separate occasions during the course of his interrogation.  Although Appellant was provided with repeated opportunities to invoke his Miranda rights, he never unambiguously invoked his right to counsel or his right to remain silent.  The atmosphere of the interrogation was not laced with coercion or intimidation.  The military judge reviewed the videotapes of the pre-polygraph and post-polygraph interviews and found that the detective's tone was never verbally abusive or threatening.  Appellant acknowledged that no one had threatened him into making a statement and that it was a product of his own free will.  The military judge did not err in denying Appellant's motion to suppress the confession.

## III.   DECISION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

United States v. Delarosa, No. 08-0390/NA

ERDMANN, Judge (dissenting):

I respectfully disagree with the majority's conclusion that Delarosa ambiguously asserted his right to remain silent. I further conclude that, under the circumstances of this case, Delarosa's assertion of his right to remain silent was not scrupulously honored. Therefore, I dissent.

The initial difference between my position and the majority's centers on whether Delarosa unambiguously invoked his right to remain silent. I agree with the United States Navy-Marine Corps Court of Criminal Appeals' conclusion on this question: "[O]nce [Delarosa] made clear that his willingness to make a statement was contingent on having a command representative present, the ambiguity was resolved." United States v. Delarosa, No. NMCCA 200602335, 2008 CCA LEXIS 4, at *12, 2008 WL 142115, at *4 (N-M. Ct. Crim. App. Jan. 10, 2008) (unpublished). This conclusion of law reflects appropriate consideration of the findings of fact, which are not clearly erroneous, and is rationally derived from all the circumstances. There is no reason to depart from that conclusion and find ambiguity where none exists.

Delarosa's written response as to whether he would waive his rights and make a statement was clear enough on its face.[1]

_____

[1] It could be reasonably argued that Delarosa clearly and unambiguously asserted his right to remain silent when, after

However, granting that Delarosa's prior conduct may have indicated a willingness to talk and perhaps created some uncertainty about the meaning of his invocation, the detectives immediately clarified any apparent confusion. Upon determining that Delarosa would not waive his right to remain silent unless a command representative was present, and since police policy would not allow that presence, the detectives had the necessary clarification and Delarosa's invocation was unambiguous.

Once the uncertainty about Delarosa's apparent change of heart was resolved, any law enforcement actions designed or reasonably likely to overcome Delarosa's resolve to remain silent were impermissible: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this

---

being advised of his rights and indicating an understanding of them, Delarosa wrote "NO" in response to a written question asking whether he wished to waive his rights and make a statement. See United States v. Rambo, 365 F.3d 906, 910 (10th Cir. 2004) ("There is no nuance nor context to vary the unequivocal meaning of Rambo's single word, monosyllabic response. His response, 'No,' could only mean an invocation of the right to remain silent."). The clarity of this invocation is enhanced by the fact that Delarosa wrote "N/A" in the next blank on the rights warning form which called for an affirmation of the voluntariness of any statement. After a rights warning, an informed decision to remain silent arguably vitiates any previous, uninformed reflections of willingness to talk, and even asking the suspect "why" could be viewed as a failure to scrupulously honor that informed invocation of the right to remain silent. But see Medina v. Singletary, 59 F.3d 1095, 1105 (11th Cir. 1995).

point he has shown that he intends to exercise his Fifth Amendment privilege." Miranda v. Arizona, 384 U.S. 436, 473-74 (1966).

If a reasonable police officer in the circumstances would understand that statement to be an invocation of the right to remain silent, then that invocation is not ambiguous. Burket v. Angelone, 208 F.3d 172, 200 (4th Cir. 2000) (citing United States v. Davis, 512 U.S. 452, 459 (1994)). Here, the detectives themselves recognized that Delarosa invoked his right to remain silent. Detective Mayer testified that "[Delarosa] had put 'No' to question number 6, so we couldn't talk to him." Similarly, when Delarosa learned his wife was taking a polygraph exam and indicated he wished to make a statement, "Detective Mayer responded that since the accused wrote 'NO' on the rights waiver form they would have to re-advise him of his rights." These statements reflect that Detective Mayer understood that Delarosa had unambiguously invoked his right to remain silent. Under these circumstances I agree with the police officer at the scene and the lower court that Delarosa unambiguously invoked his right to remain silent when he indicated he was unwilling to talk without a command representative present.

The invocation of the right to remain silent does not, however, impose a permanent bar against further questioning. Weeks v. Angelone, 176 F.3d 249, 267 (4th Cir. 1999), and

Vujosevic v. Rafferty, 844 F.2d 1023, 1028 (3d Cir. 1988) (both citing Michigan v. Mosley, 423 U.S. 96, 102-03 (1975)).  The admissibility of any subsequent statements depends upon an analysis as to whether the law enforcement officials involved "scrupulously honored" the invocation of the right to remain silent.  Mosley, 423 U.S. at 103-04.  "[T]he touchstone is whether a 'review of the circumstances' leading up to the suspect's confession reveals that his 'right to cut off questioning was fully respected.'"  Weeks, 176 F.3d at 268 (quoting Mosley, 423 U.S. at 104).

From the outset, the Norfolk police detectives seemed determined to get Delarosa to speak.  They admittedly used a ruse to get Delarosa to the police station and "Detective Bynum admitted that he would have done anything he legally could have done to keep the accused at the [Police Operations Center], if he had asked to leave."  At no point did the detectives inform Delarosa that he was free to go.  Rather, they expressed an intention to keep Delarosa at the police station and they succeeded in doing just that despite lacking probable cause to arrest Delarosa.

After Delarosa invoked his right to remain silent, the detectives did not cease their efforts to get Delarosa to talk. Detective Bynum immediately asked Delarosa, "'Why did you say "No"?'"  Delarosa explained that he wanted a representative from

his command present.  As the detectives left the interrogation room, Bynum told Delarosa to "consider" his decision, which under the circumstances could only mean to "reconsider," and to knock on the door when he decided what he wanted to do.  The door in question was the exit to a small, spartan interrogation room where Delarosa sat isolated.  A reasonable man, having been informed of his custodial interrogation rights and then told to knock on the only available exit after reconsidering his previous election to remain silent would conclude he was not free to leave unless he changed his mind.

Nonetheless, the detectives did not wait for Delarosa to make up his own mind.  After about thirty-five minutes Detective Mayer opened the door and asked if Delarosa was willing to take a polygraph exam.  Although such a question in and of itself may not be an interrogation, see Rhode Island v. Innis, 446 U.S. 291, 308 (1980) (Stevens, J., dissenting), the question imparts a desire to have the suspect talk about the matter under investigation.  Having kept Delarosa isolated after he invoked his right to remain silent and with no change in circumstance, Norfolk detectives directly asked Delarosa to make a statement via a polygraph exam without any reference to his rights or his prior invocation of the right to remain silent.  While this tactic certainly did not scrupulously honor Delarosa's invocation of the right to remain silent, it was effective.

Delarosa abandoned his resolve to remain silent and agreed to take a polygraph exam, but was again left alone in the interrogation room while the detectives picked up his wife for questioning.

For approximately the next two hours, Delarosa remained isolated in the interrogation room. Detective Mayer then asked if Delarosa needed anything and Delarosa indicated he wished to use the bathroom. Mayer escorted Delarosa to the bathroom and remained outside while Delarosa was in the bathroom. After he exited the bathroom, Delarosa asked to use the telephone and Mayer responded that it would be a while because Mayer was busy. When Delarosa asked what was going on, Mayer responded that Delarosa's wife was in an interview room preparing for a polygraph exam and that Delarosa could use the phone after the polygraph exam was complete. Delarosa expressed some surprise that his wife was at the police station and asked to talk to with her. He was told that he could not see her until after her polygraph exam. At this point Delarosa, who had already abandoned his resolve to remain silent when he agreed to a polygraph exam, again indicated that he wanted to talk to the detectives. Mayer responded that he would have to re-advise Delarosa of his rights.

The circumstances of Delarosa's case stand in contrast to those of Mosley and United States v. Watkins, 34 M.J. 344

6

(C.M.A. 1992), where officers were found to have honored a suspect's invocation of rights.  In Mosley the Supreme Court found it significant that:  (1) after Mosley invoked his right to remain silent, officers ceased questioning right away; (2) a significant period of time elapsed before questioning resumed; (3) the officers informed Mosley of his rights a second time; and (4) the later questioning was about a distinctly different offense.  423 U.S. at 106-07.  In Watkins this court found the following factors significant with respect to whether Watkins' invocation of the right to remain silent had been honored:  (1) agents gathered additional evidence and sought to interview Watkins two and one-half hours after he initially invoked his right to remain silent; (2) Watkins was reminded of the earlier rights warning; (3) the second interview was at Watkins' quarters and not in the "coercive environment arising from being in custody at the police station"; and (4) after Watkins requested counsel the interview stopped, but Watkins himself initiated further conversation.  34 M.J. at 347.

Contrast Mosley and Watkins with the manner in which the Norfolk police treated Delarosa's invocation of the right to remain silent.  When Delarosa invoked his right, he was first questioned as to why he was invoking it.  Once it was clarified that he was invoking his right to remain silent, he was told to "consider what he would like to do."  Delarosa was kept in an

7

eight-by-twelve-foot interrogation room at the police station despite the absence of probable cause to arrest him and was told to knock on the door only after he had considered his decision to remain silent. Thirty-five minutes later the same officers in the same location once again approached Delarosa and asked if he would take a polygraph exam with no mention of his rights or his prior invocation of the right to remain silent. Although Delarosa agreed to take a polygraph exam at that time, he was left in isolation for another two hours. After discovering that the police were preparing to administer a polygraph exam to his wife, Delarosa once again abandoned his resolve and informed the detectives that he wanted to waive his rights and talk with them.

These circumstances eroded any resolve Delarosa had to remain silent and that erosion was the product of the conduct of the Norfolk detectives. I therefore conclude that Delarosa unambiguously invoked his constitutional right to remain silent and that the Norfolk detectives did not scrupulously honor that invocation. Delarosa's ultimate waiver of the right to remain silent and his written confession were not the product of a free and voluntary election. I would reverse the decision of the United States Navy-Marine Corps Court of Criminal Appeals, set aside the findings and sentence, and authorize a rehearing.