# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

## Rudolph P. REIMONENQ
### Damage Controlman Third Class (E-4), U.S. Coast Guard

### 25-007(62)
### Docket No. 1509

### 18 June 2025

General Court-Martial convened by Commander, Coast Guard Atlantic Area. Article 39(a), UCMJ, session at Norfolk, Virginia, on 14 and 15 January 2025.

| | |
|---|---|
| Military Judge: | CDR Jeffery C. Barnum, USCG |
| Appellate Government Counsel: | LCDR Peter W. Link, USCG |
| Civilian Defense Counsel: | Mr. Scott Hockenberry, Esq. |
| Appellate Defense Counsel: | CDR Jason W. Roberts, USCG |

### BEFORE
### McCLELLAND, JUDGE & BRUBAKER
Appellate Military Judges

JUDGE, Judge:

This is a Government appeal under Article 62, Uniform Code of Military Justice (UCMJ). Appellee is charged with attempted murder, two specifications of carrying a concealed weapon, and one specification of dereliction of duty. Appellee filed a motion to suppress statements he made to shipmates and separately to Coast Guard Investigative Service (CGIS) agents. The military judge granted in part and denied in part the suppression motion. The Government gave timely notice and filed this appeal.

The Government asserts:

I. The military judge abused his discretion when he found Appellee did not knowingly and intelligently waive his Article 31(b) rights; and

II.     The military judge misapplied the law when he found the Appellee in custody, thereby triggering the Appellee's Fifth Amendment rights. Furthermore, if the Appellee was in custody, the military judge abused his discretion when determining the Appellee did not knowingly and intelligently waive his Fifth Amendment rights.

We conclude that the military judge did not misapply the law in determining Appellee was in custody at the time that CGIS interrogated him and did not abuse his discretion by concluding the Government failed to demonstrate that Appellee knowingly and intelligently waived his rights under Article 31(b), UCMJ, and the Fifth Amendment.

## Background

On 21 March 2024, Appellee departed his unit, USCGC *Legare*, which had just returned from a 47-day patrol. Appellee was not scheduled to return to *Legare* until 26 March 2024. On 25 March 2024, *Legare*'s Commanding Officer (CO) received a report from the Coast Guard Insider Threat Program concerning messages Appellee had sent using a Coast Guard computer in February while *Legare* was underway. The CO convened a Crisis Intervention Team to discuss the report with the primary focus being Appellee's well-being along with his wife's well-being. The CO determined that Appellee would be transported to the Naval Medical Center Portsmouth for a Command Directed Mental Health Evaluation the following day when he reported for duty. Concerned that Appellee might have a weapon, and his escorting shipmates would not be armed, the CO directed the command chief and oncoming officer of the day (OOD), Boatswain's Mate Chief (BMC) CJ, to ask for consent to search Appellee when he arrived and, if he refused, the CO ordered a search be conducted.

Appellee arrived earlier than expected on 26 March 2024, so he was already aboard *Legare* when the off-going OOD met him and directed him to the Chiefs' Mess. There, BMC CJ asked if Appellee would consent to a search of his backpack; Appellee "refused but stated that he would consent to search if he could visit his car first because [he] was concerned that BMC CJ would not like what he found in the backpack." App. Ex. XII at 7. A search of the backpack revealed a rifle with a folded stock and seven loaded magazines. After securing the weapon and ammunition, BMC CJ asked Appellee why he was carrying a weapon. Appellee responded it was for protection because he lived in a "bad neighborhood." App. Ex. XII at 7. BMC CJ then

searched Appellee, noted a chest holster without a weapon, and asked Appellee where the weapon was located. Appellee replied that it was in his vehicle located on board Base Portsmouth. BMC CJ ordered Appellee to surrender his car keys. While BMC CJ was securing the rifle, ammunition, and holster in *Legare*'s armory, EMC STL asked Appellee whether he noticed the signs when driving aboard Base Portsmouth that personal firearms must be checked in and Appellee volunteered that there was additional ammunition in his jacket. Appellee was never advised of his Article 31, UCMJ, rights during this period.

The mental health evaluation determined that Appellee, who denied any suicidal or homicidal ideations, was not a threat to himself or others, and Appellee was brought to the Unaccompanied Personnel Housing (UPH) building where he was placed in a room with a pair of bunks and desks along with a head. *Legare* crew members maintained a watch over Appellee until CGIS agents arrived to interview him at around 1600.

After taking some biographical details, Special Agent JT began to advise Appellee of his Article 31 rights using a CGIS-5810 form. After reading from the form that Appellee was suspected or accused of communicating a threat and bringing a firearm onto a military base, Special Agent JT told Appellee "We're not suspecting you of anything. This is just what's been brought to our attention." App. Ex. IX at 32. At the motion hearing, he testified that he misspoke when he said this, and the lead agent testified that Special Agent JT admitted this was a mistake when they were reviewing the interview. R.15JAN at 52, 56. Proceeding through the form, Special Agent JT asked Appellee if he understand his right to counsel, leading to this exchange:

| | |
|---|---|
| Appellee: | Yes, may I please have a lawyer? |
| JT: | You said want a lawyer? |
| Appellee: | Yes. |
| JT: | Okay. |

App. Ex. IX at 34–35. Appellee almost immediately pointed to the CGIS-5810 form:

| | |
|---|---|
| Appellee: | Because this right here already has me worried. |
| JT: | Which part? |
| Appellee: | The communicating a threat. I did not communicate a threat. |

*Id.* at 35. The agents told Appellee that they couldn't talk to him about that until they "g[o]t through all this paperwork," to which Appellee replied, "Okay. I do want a lawyer after." *Id.*

After completing the rights advisement, the agents asked Appellee if he would be willing to discuss his side of the story or they could stop the questioning if he wanted. They moved to the waiver portion of the form; Appellee indicated he understood and signed the waiver. Neither of the agents who interviewed Appellee provided a cleansing warning related to his earlier statements in the Chiefs' Mess.

During the interview, Appellee admitted to bringing guns aboard *Legare*; to suicidal ideations (contrary to his statements at his mental health evaluation earlier that day); and that, in addition to wanting to kill himself, he wanted to kill his wife's cousin and his CO.

In a 33-page ruling, the military judge concluded that the majority of Appellee's statements to command personnel were admissible under a public safety exception to Article 31's general rule requiring warnings before questioning. He, however, granted the motion to suppress Appellee's answer to a question about *why* he had weapons, concluding it fell outside of the public safety exception, as well as Appellee's statements to CGIS, concluding that Appellee had not knowingly and intelligently waived his rights.

## Discussion
### Standard of Review

In an Article 62, UCMJ, appeal, we act only with respect to matters of law and are bound by the military judge's factual findings unless they are unsupported by the record or clearly erroneous. *United States v. Pugh*, 77 M.J. 1, 3 (C.A.A.F. 2017). We review the evidence in the light most favorable to the party that prevailed at trial, which in this case is Appellee. *Id*. In Article 62, UCMJ, appeals, the "reviewing court may not 'find its own facts or substitute its own interpretation of the facts.' " *United States v. Becker*, 81 M.J. 483, 489 (C.A.A.F. 2021) (quoting *United States v. Cossio*, 64 M.J. 254, 256 (C.A.A.F. 2007)).

A military judge's decision to exclude evidence is reviewed for an abuse of discretion. *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003). "The abuse of discretion

standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Smith*, 83 M.J. 350, 355 (C.A.A.F. 2023) (cleaned up). "Where the military judge places on the record his analysis and application of the law to the facts, deference is clearly warranted. On the contrary, if a military judge fails to place his findings and analysis on the record, less deference will be accorded." *Id.* (cleaned up).

These standards also apply to interlocutory appeals under Article 62, UCMJ. *United States v. Mitchell*, 76 M.J. 413, 417 (C.A.A.F. 2017). We review de novo any legal conclusions supporting the suppression ruling, including the question of whether the accused was in custody for purposes of *Miranda* warnings. *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The voluntariness of a confession is a question of law we review de novo. *United States v. Lewis*, 78 M.J. 447, 453 (C.A.A.F. 2019).

Here, the military judge made extensive findings of fact spanning 18 pages, with additional findings of fact interspersed through the remainder of his decision. Those findings of fact are supported by evidence in the record and are not clearly erroneous.[1]

The focus of this Article 62 appeal is whether Appellee's waiver of his rights during his CGIS interview was involuntary under M.R.E. 304(a) because it was obtained in violation of his Article 31 and Fifth Amendment rights. We begin by assessing the military judge's determination that Appellee was in custody when interviewed by the CGIS agents, which we review de novo based on the military judge's findings of fact.

The Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action *in any significant way*." *Miranda*, 384 U.S. at 444 (emphasis added). As the military judge correctly stated in his decision, a court determines whether a suspect is in custody

---

[1] The only challenge the Government raises to the military judge's findings of fact is to his conclusion that Appellee "has experienced intellectual challenges throughout his life." App. Ex. XII at 28. The Government argues that the military judge's interpretation of evidence regarding Appellee's mental capacity is based on "unreasonable inferences." Appellant's Br. at 31. However, the facts underlying the contested interpretation are supported by evidence in the record and we are not free to substitute our own interpretation for the military judge's. *Becker*, 81 M.J. at 489.

for *Miranda* purposes by considering " 'all of the circumstances surrounding the interrogation' to determine 'how a reasonable person in the position of the [accused] would gauge the breadth of his or her freedom of action.' " *Chatfield*, 67 M.J. at 437 (quoting *Stansbury v. California,* 511 U.S. 318, 322, 325 (1994)). "We consider the facts objectively in the context of a reasonable person's perception when situated in Appellant's position." *Chatfield*, 67 M.J. at 437.

Noting that the military judge correctly recited the law and relied upon findings of fact that are not clearly erroneous, we conclude that the military judge was correct in determining that the accused was in custody at the time he was interviewed by CGIS. On his arrival at *Legare*, Appellee was intercepted and taken to the Chiefs' Mess, had his belongings (including his car keys, wallet, and cell phone) taken away, was escorted to a mental health examination, then escorted to the UPH and placed in a room under watch. A crewmember remained posted outside the room, and although they did not have firearms, at least one posted crewmember was carrying pepper spray and handcuffs. In total, a period of ten hours in which Appellee was not in control of his movements passed prior to the arrival of the CGIS agents. Under the totality of these circumstances, and the additional, detailed factual findings of the military judge, a reasonable person would "have felt he or she was not at liberty to terminate the interrogation and leave." *Mitchell*, 76 M.J. at 417 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

The Government's arguments that these conditions did not amount to a custodial status are wholly unpersuasive. We address two of them here. First, the Government asserts that when the military judge concluded that Appellee "reasonably felt he was not at liberty to terminate the interview and leave," he was applying a subjective, rather than objective, test. We disagree. A subjective test asks whether an individual has an actual belief regarding a pertinent fact, regardless of whether others would find that belief reasonable. *J.D.B. v. North Carolina*, 564 U.S. 261, 270–71 (2011); *United States v. Lewis*, 78 M.J. 602, 613 (Army Ct. Crim. App. 2018), *aff'd,* 78 M.J. 447 (C.A.A.F. 2019). Here, the military judge correctly recited the objective test. In his analysis, he simply used a different formulation to state that a reasonable person in Appellee's circumstances would not have felt free to terminate the interview and leave. This is an objective test and a correct application of the law.

Second, the Government asserts that only circumstances created by CGIS should be considered in determining whether a person is in custody. This assertion is unsupported by military case law and is instead based on civilian case law analyzing circumstances created by non-governmental actors, *e.g.*, a hospital admission or being a passenger in a car. *See United States v. Campos-Ayala*, 105 F.4th 235, 249–50 (5th Cir. 2024); *United States v. Jamison*, 509 F.3d 623, 629–32 (4th Cir. 2007). This assertion also ignores the fact that all the circumstances of Appellee's custody were imposed by his CO, a government actor with roles and duties directly related to the enforcement of military discipline. *See, e.g.*, *United States v. Hutchins*, 72 M.J. 294, 296–98 (C.A.A.F. 2013) (noting Hutchins' custodial status based on command placing him in trailer under guard).

Because Appellee was in custody, his Fifth Amendment right to counsel applied. *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). When a person in custody wants an attorney, "the interrogation must cease until an attorney is present." *Miranda,* 384 U.S. at 474. Here, Appellee clearly and unambiguously invoked his right to counsel as soon as he was informed of it:

| | |
|---|---|
| Appellee: | Yes, may I please have a lawyer? |
| JT: | You said want a lawyer? |
| Appellee: | Yes. |
| JT: | Okay. |

App. Ex. IX at 34–35. Once this request for a lawyer was made, the interrogation had to stop until counsel was made available. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). The agents were required to "scrupulously honor" Appellee's invocation of his right to counsel. *United States v. Delarosa*, 67 M.J. 318, 324 (C.A.A.F. 2009).[2] Any subsequent questioning after invocation is prohibited, even if a suspect waives his Fifth Amendment right to counsel, because that waiver is presumed to be involuntary. *Maryland v. Shatzer*, 559 U.S. 98, 104–05 (2010). The rationale for this presumption is to ensure that the subsequent waiver is not the product of "inherently compelling pressures" but rather "the purely voluntary choice of the suspect." *Id.* (quoting *Arizona v. Roberson*, 486 U.S. 675, 681 (1988)). The Supreme Court found it "easy to believe" that a suspect in the paradigm *Edwards* case might be badgered into abandoning his

---

[2] To fulfill this requirement, CGIS-5810, Part II in fact instructs the agents: "If the suspect/accused says "yes," stop the questioning until he/she has a lawyer."

right to counsel while being held in custody "cut off from his normal life and companions, thrust into and isolated in an unfamiliar police-dominated atmosphere where his captors appear to control his fate." *Shatzer,* 559 U.S. at 106 (citation and internal quotation marks omitted). The paradigm *Edwards* case involves a suspect held in custody who invokes the right to counsel, whereupon interrogation stops, but resumes the next day or days later.

The invocation of the right to counsel does not mean law enforcement can never question a suspect without counsel present. The logical endpoint of the bar to further questioning is the termination of *Miranda* custody and any of its lingering effects. *Id*. at 108. Officers can resume an interrogation, however, if the suspect reinitiates further "communication, exchanges, or conversations" with the agents if the contact "represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation," but not if the communication relates to the "routine incidents of the custodial relationship." *Edwards,* 451 U.S. at 484–85; *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983). The *Edwards* rule "does not merely prohibit further interrogation without the benefit of counsel, it prohibits further 'communication, exchanges, or conversations' that may (and in this case, did) lead to further interrogation." *Hutchins*, 72 M.J. at 298. In addition to routine communications incident to the custodial relationship, officers may also clarify an ambiguous statement regarding the invocation of rights. *Davis v. United States*, 512 U.S. 452, 461–62 (1994); *Delarosa*, 67 M.J. at 320.

There was nothing ambiguous about Appellee's invocation of his right to counsel. The military judge, however, found that Appellee reinitiated contact with the investigators when immediately after invoking his right to counsel he stated:

| | |
|---|---|
| Appellee: | Because this right here already has me worried. |
| JT: | Which part? |
| Appellee: | The communicating a threat. I did not communicate a threat. |

App. Ex. IX at 35. While this exchange is not a routine incident of the custodial relationship, it is less than clear that it indicates a desire to have a generalized discussion about the investigation. His comment explains *why* he wants counsel, which is not necessary to his invocation of his right and not necessarily an invitation to have a generalized discussion about the allegations. The agents then focus Appellee back to completing the CG-5810 and, when Appellee asks who said

he communicated a threat,[3] the agents responded that they could not discuss that "until we get through all this paperwork." Appellee replied, "Okay. I do want a lawyer after." App. Ex. IX at 36. This certainly could be read to indicate that Appellee still wanted a lawyer after the CG-5810 (the "paperwork") was completed, not after an interrogation. But because it is not clearly erroneous, we are bound by the military judge's interpretation of these communications that Appellee re-initiated contact with the agents about the content of the investigation and that "after" meant after the interrogation was completed.

The agents continued to work through the rights form with Appellee and also provided a brief explanation of what type of communication would constitute a threat—a role counsel would have filled if the interrogation was stopped, and counsel provided. While the agents did not attempt to elicit any incriminating statements from Appellee during the completion of the rights advisement portion of the form, completion of the form was not required to "scrupulously honor" his invocation of his right to counsel. *See, e.g., California v. Prysock*, 453 U.S. 355, 360 (1981) (*Miranda* warning defective if linked with some future point in time after the police interrogation). Finally, after the agents explained why it would benefit Appellee to speak to them, Appellee agreed to talk to the agents and signed the form. At no point in the interrogation was he offered an opportunity to consult with counsel.

Even acknowledging the conclusion that Appellee re-initiated contact, and that the *Edwards* presumption therefore does not apply, the burden of establishing by a preponderance of evidence that Appellee's waiver of his right to consult with counsel and to remain silent was voluntary continues to rest on the Government. M.R.E. 304(f)(6–7); *Lewis*, 78 M.J. at 453. Reviewing de novo, we agree with the military judge that the Government failed to meet this burden. Specifically, the Government has failed to demonstrate that under a totality of the circumstances, Appellee's waiver was knowing and intelligent.

The military judge cited five factors weighing in favor of his determination that, considering the totality of the circumstances surrounding the interrogation, Appellee was "deprive[d] . . . of knowledge essential to his ability to understand the nature of his rights and the

---

[3] This question does seem to indicate a desire to discuss the investigation.

consequences of abandoning them." *Moran v. Burbine*, 475 U.S. 412, 424 (1986). The first was Special Agent JT's affirmative misstatement that the agents did not suspect him of anything. We need not decide here whether such a misstatement, standing alone, undermines a suspect's warnings under Article 31(b), UCMJ, such that any ensuing statements are per se inadmissible. *But see United States v. Patterson*, No. 202200262, 2024 WL 1453792, at *6 (N-M. Ct. Crim. App. Apr. 4, 2024) ("The agent's departure from the statute's mandates—especially his explicit statement that he was *not accusing Appellant of anything*—rendered the rights advisement inadequate and Appellant's subsequent statements inadmissible in accordance with Article 31(d)."); *see also, United States v. Campbell*, 76 M.J. 644, 655 (A.F. Ct. Crim. App. 2017) ("[W]hen reading a suspect his or her rights, criminal investigators are not authorized, and have no legitimate purpose, to create confusion about any aspect of the rights advice . . . ."). As the military judge aptly stated, "Even if such a misstatement doesn't completely vitiate the warnings under Article 31, it nonetheless significantly undercuts the accused's understanding of 'the nature of the right being abandoned and the consequences of the decision to abandon it.' *Moran*, 475 U.S. at 421." App. Ex. XII at 28.

We agree. This is further enhanced by the agent's repeated reference to the rights advisement as "paperwork" and his statements that the potential offenses listed on the Form CG-5810 were just what was "brought to our attention," that perhaps something Appellee said may have been "taken out of context," and "that's why we want to talk to you." App. Ex. IX at 30–33. Combined with the fact that earlier in the day Appellee was questioned as part of a mental health examination and then escorted to a UPH room without apparently being told what was happening to him next, being misled into thinking these criminal investigators did *not* suspect him of anything significantly impacted his ability to knowingly and intelligently waive his rights.

The Government's assertion that the military judge failed to consider *Colorado v. Spring*, 479 U.S. 564 (1987) is unavailing. The Government correctly notes that the Supreme Court held that not informing Spring he was a suspect in a homicide investigation after his arrest on gun trafficking charges did not affect his Fifth Amendment waiver in a constitutionally significant manner because he was not required to be informed of all the information affecting that waiver. *Id.* at 577. The Court, however, expressly noted that "affirmative misrepresentations by the

police [may be] sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege," and that "[i]n this case, we are not confronted with an affirmative misrepresentation by law enforcement officials as to the scope of the interrogation and do not reach the question whether a waiver of *Miranda* rights would be valid in such a circumstance." *Id*. at 576, n.8. As described above, in the matter before this court, we *are* confronted with such an affirmative misrepresentation.

Second, the military judge cited the lack of cleansing warnings by CGIS regarding Appellee's earlier, unwarned statements to command representatives. Because we agree with the military judge that at least one earlier statement was inadmissible, we need not address whether cleansing warnings are applicable to unwarned statements that are nonetheless admissible. The lack of cleansing warnings is, therefore, a factor properly to be considered in determining whether Appellee's waiver of his rights was knowing and intelligent. *United States v. Benner*, 57 M.J. 210, 213 (C.A.A.F. 2002) ("[W]hile a cleansing warning is not a prerequisite to admissibility, an earlier unwarned statement and the lack of a cleansing warning before the subsequent statement are also part of the totality of the circumstances.") (internal quotations marks and citation omitted).

Third, the military judge considered Appellee's intellectual capacity. As we have discussed, the military judge's interpretation of this is supported by evidence in the record and is not clearly erroneous. While Appellee's intellectual challenges would not, on their own, prevent him from knowingly and intelligently waiving his right to remain silent and his right to counsel, the fact that he confused his rights advisement with a page 7,[4] his poor academic performance in high school, and his barely-qualifying ASVAB score support the finding he did not know and understand what he was giving up in waiving his rights.

Fourth, the military judge considered the circumstances surrounding the interrogation, including that Appellee had been "under careful watch for the entire day" and that "his movement was so restricted" that he was in a custodial situation. App. Ex. XII at 29. Again, we

---

[4] A page 7 is a CG-3307 Administrative Remarks form which is used to document events, counseling, qualifications, or other matters in a member's military record.

agree that Appellee was in custody, that his movement was sharply curtailed, and that this factor weighs against a finding of voluntariness.

Finally, the military judge considered Appellee's invocation of his right to counsel and CGIS's failure to stop the interrogation and provide counsel. As the military judge stated, "[W]hile the interrogation was not required to stop because [Appellee] immediately re-initiated with CGIS . . ., given his intelligence and experience, the fact that CGIS did not comply with his request bears upon whether his subsequent waiver was knowing and voluntary." App. Ex. XII at 29. This failure to stop after invocation was particularly significant given a lawyer's "unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation." *Fare v. Michael C.*, 442 U.S. 707, 719 (1979).

The combination of depriving Appellee of the opportunity to consult with counsel coupled with his intellectual capacity and the affirmative misstatement that the agents did not suspect him of anything has, of course, a far greater impact than considering any single factor in isolation. Contrary to the Government's arguments attacking the weight of each factor considered separately, the military judge was clear that he did not consider any one factor as sufficient by itself to render Appellee's waiver of rights involuntary. Instead, he meticulously recorded his analysis and application of the law to the facts and concluded that under *all* the circumstances, considered together, Appellee's waiver of his rights was not knowing and intelligent, and his statements were thus inadmissible under M.R.E. 304. The military judge's well-reasoned order is clearly entitled to deference and was well within his range of choices.

In sum, giving all deference due to the military judge and reviewing his conclusions of law de novo, we hold that the Government did not establish by a preponderance of the evidence that Appellee's waiver of his right to counsel and to remain silent was knowing and intelligent under both M.R.E. 304(a) and the Fifth Amendment.

## Decision

The Government's appeal is denied. The military judge's order granting the suppression motion is affirmed.

Chief Judge McCLELLAND and Judge BRUBAKER concur.



For the Court,

Rebecca P. Pskowski
Acting Clerk of the Court